United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 17, 2003**

Charles R. Fulbruge III
Clerk

REVISED September 26, 2003

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-41592

_____

ALVIN ANDREW KELLY,

Petitioner-Appellant,

v.

JANIE COCKRELL, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Eastern District of Texas

_____

Before BARKSDALE, DEMOSS, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:[*]

Petitioner Alvin Andrew Kelly (Kelly), convicted of capital murder in Texas and sentenced

to death, appeals the denial of federal habeas relief. In his "Application for Issuance of a Certificate

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

of Appealability [COA] on Rejected Requests," Kelly raises following claims: (1) his conviction and sentence constitute a denial of due process of law because he is actually innocent; (2) the prosecutor violated his due process rights by arguing incorrectly to the jury that his former wife should not be considered an accomplice; (3) his death sentence constitutes cruel and unusual punishment because it was secured in part through the use of perjured testimony; (4) the denial of sufficient funds to adequately investigate and prepare his defense constitute a denial of due process of law and cruel and unusual punishment; (5) the failure to provide sufficient funds to investigate and prepare his defense rendered counsel's performance ineffective; (6) the state court's denial of his motion to recuse itself denied him due process; and (7) counsel rendered ineffective assistance at trial.[1] For the reasons stated below, we DENY a COA with respect to each of the seven claims.

I.    FACTUAL AND PROCEDURAL HISTORY.

On the morning of May 1, 1984, in Gregg County, Texas, the bodies of Jerry Morgan, his wife Brenda, and their twenty-two month old son Devin were discovered in their home by other family members. Each person had died of gunshot wounds. Various items were missing from the victims' home, including a 1977 Pontiac Catalina, a .22 caliber revolver, a .380 semi-automatic pistol, a 7-millimeter rifle, a Remington 870 pump action shotgun, a .38 caliber derringer, a television set, a video recorder, a stereo, decorative brass butterflies, and a coffee maker.

These murders remained unsolved for six years. In 1990, a man named Chris Vickery called

---

[1] Also, the district court granted a COA with respect to four claims that have not yet been briefed and thus are not before us: (1) Kelly's conviction was obtained through the prosecution's use of perjured testimony; (2) the prosecution failed to disclose exculpatory evidence; (3) the prosecution did not disclose that it had agreed not to prosecute Kelly's former wife or brother-in-law in exchange for their testimony; and (4) the district court made impermissible credibility determinations in connection with the grant of summary judgment.

the Gregg County Sheriff's Office and indicated that his former wife, Cynthia Kelly (Cynthia), had information for the authorities. At that time, Cynthia lived in Michigan, and Kelly was serving a 30-year sentence in Texas for the murder of John Ford.[2] The authorities contacted Cynthia, and ultimately obtained an indictment charging Kelly with the capital murder of Devin Morgan during the course of the robbery of his father, Jerry Morgan.

At trial, Steven Kelly, Kelly's younger brother, testified that Kelly and he were in the business of selling drugs. Kelly's source of drugs or "main man" was Walter Shannon.[3] Several days prior to the instant offense, Steven drove with Kelly and Ron Wilson, a fellow drug trafficker, to a home later identified as the victims' home. Prior to exiting the vehicle, Kelly instructed Steven to remain in the vehicle. Disregarding that instruction, Steven walked around to the back of the house because he heard an argument. Steven observed Kelly pointing a gun at Jerry Morgan and threatening "I want you to know that I can kill you at any time." Kelly noticed Steven watching and angrily ordered him back to the vehicle. As Steven returned to the vehicle, he heard Wilson arguing with a woman inside the home. Kelly and Wilson also returned to the vehicle. As the three men drove away, Wilson, who was obviously upset, said to Kelly "I told you not to bring him [Steven] because . . . we're supposed to take care of some business, and . . . we didn't take care of it, . . . we're supposed to prove a point, and now, that they're going to be upset with us." Kelly responded "we can always come back later and take care of it, . . . there's no problem there."

Steven further testified that a few days later on the night of April 30, 1984 (the night of the

---

[2] Kelly had pleaded guilty to the unrelated murder of John Ford, which occurred after the instant offense.

[3] Walter Shannon was also known as W.W. Shannon.

3

instant offense), Kelly, Wilson and Cynthia arrived at his house after he and his wife had gone to bed. Appearing very nervous and in a hurry, Kelly said he was in serious trouble and needed money. Kelly confessed that he had killed the family Steven had seen him threaten, and the child was "involved." Kelly then opened a briefcase, handed Steven a pistol,[4] and asked for "five hundred dollars to get out of town." Steven gave Kelly the five hundred dollars, and Kelly left with Cynthia and Wilson.

Cynthia testified that she met Kelly sometime in 1982 or 1983 and they began living together in Tyler, Texas.[5] Cynthia thereafter became addicted to methamphetamine and would frequently accompany Kelly while he was conducting drug deals. Kelly carried a firearm and had Cynthia carry a pistol to "watch his back."[6]

On the evening of April 30, 1984, after drinking beer and injecting methamphetamine, Cynthia, Kelly, and Wilson drove to the victims' home. Upon arrival, Kelly ordered Cynthia to remain in the vehicle. Cynthia had been unaware of both the destination and the purpose of this trip. While waiting for the men, Cynthia heard gunfire and a baby crying. She entered the home and saw that Kelly had a woman (Brenda Morgan) pinned against the wall and that a baby (Devin Morgan) was crying. Cynthia picked up the child and shielded him from the sight of his mother struggling with Kelly. Kelly shot Brenda in the back of the neck and dragged her to a bedroom. Cynthia put the baby in a chair and followed Kelly to the bedroom. Brenda's husband Jerry had already been shot, and Kelly placed Brenda next to him. Brenda begged Cynthia for help, and Cynthia responded by

---

[4] Kelly was wearing a pistol when he entered Steven's house but he did not give that gun to Steven.

[5] Cynthia and Kelly were married after the instant offense on September 5, 1985.

[6] Kelly told Cynthia that the police could not perform a ballistics test on a .22 caliber gun.

4

retrieving a towel and placing it under Brenda's head.

Cynthia returned to the living room and attempted to comfort the crying baby. Kelly grabbed the crying infant from Cynthia and shot him in the head. Kelly aimed his gun at Cynthia and ordered her to return to the vehicle. As she exited the home, Cynthia heard Kelly again shoot the infant. Cynthia testified that Kelly used the same gun, a .22 caliber pistol, to shoot both Brenda and the baby.

Kelly and Wilson took several items from the victims' home, including guns, decorative brass butterflies, and a coffee maker. Kelly, with Wilson as a passenger, drove the victims' car and ordered Cynthia to follow him in their vehicle. Pursuant to Kelly's instructions, the three wiped the victims' car to destroy any fingerprints and abandoned the car in a hospital parking lot in Tyler, Texas. Subsequently, while driving, Kelly and Wilson discussed needing money, and the three "ended up at" Steven's home. Cynthia's memory became "blurry" after that point; however, she did remember Kelly and Steven retreating to the pool room to have a conversation.[7]

The State introduced evidence corroborating several points of Cynthia's testimony, including the location of the mother's and child's gunshot wounds, the caliber of the murder weapon, the location and position of the bodies in the home, the towel that was found under the mother's head, and the location of the victims' car (which was devoid of fingerprints). The State also introduced evidence that Jerry and Brenda Morgan had been City Marshal Reserve Officers and argued that Kelly's motive for killing the Morgans was that they were providing information to law enforcement.

Additionally, Cynthia's sister Violet Brownfield testified that Kelly had "bragg[ed]" about killing a family, including a child. Danny Moore, who had met Kelly through Moore's cousin, testified that Kelly said he collected "debts at a forty-sixty split" for Walter Shannon. Moore further

_____

[7] Cynthia did not hear any of their conversation.

5

testified that Kelly said he had "taken care of that job . . . [and] need[ed] to go see the man about some money." Kelly further explained that "that man, his old lady, and the kid . . . they're not coming back." Kelly became angry and said "I warned them, they had a chance. [T]hey wouldn't do nothing." Kelly warned that "there's going to be a lot more people end up like this if they don't pay up."

Kelly's defense theory was that the victims were killed by an unidentified black assailant. He relied on the following evidence: (1) hairs with Negroid characteristics were found in vacuum sweepings from the Morgans' home; (2) a pick-up truck was stolen from a parking lot near the victims' abandoned car; (3) two black males were apprehended for the theft of that truck; and (4) a necklace was recovered which two of the victims' family members initially identified as belonging to Brenda Morgan. Kelly's theory was that Cynthia had a relationship with a black man and she had fabricated her story to protect that man and/or to attempt revenge against Kelly.[8]

In October of 1991, a Gregg County, Texas jury found Kelly guilty of capital murder. At the punishment phase of the trial, the State introduced evidence that Kelly has a bad reputation for violence and a record of criminal convictions, including burglary, unlawful weapon possession, controlled substance delivery and possession, aggravated sexual assault, and murder. The jury affirmatively answered the special issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure, and the trial court sentenced Kelly to death. The Texas Court of Criminal Appeals affirmed the conviction and sentence, *Kelly v. State,* No. 71,361 (Tex.CrimApp. June 26, 1996), and

---

[8] The State introduced evidence through Timothy Fallon, a Trace Evidence Analyst, that the hairs that had Negroid characteristics did not match either of the two black men who were apprehended for theft of the truck. Additionally, Fallon explained that hair that had Negroid characteristics did not necessarily come from a black individual and could come from a Caucasian individual.

the Supreme Court denied Kelly's petition for certiorari on March 24, 1997. *Kelly v. Texas,* 520 U.S. 1145 (1997).

Kelly filed a state habeas petition, and the state trial court recommended denying relief. The Court of Criminal Appeals denied relief without written order, *Ex parte Kelly,* No. 36,791-10 (Tex.Crim.App. April 8, 1998), and the Supreme Court denied certiorari on October 5, 1998. *Kelly v. Texas,* 525 U.S. 891 (1998).

The federal district court dismissed Kelly's first federal habeas petition as unexhausted. Kelly then filed a second application for state post-conviction relief, which was dismissed as an abuse of the writ by the Texas Court of Criminal Appeals. *Ex Parte Kelly,* No. 36,791-02 (Tex.Crim.App. September 13, 2000). Kelly then filed the instant petition, which the district court denied. As previously indicated, the district court granted Kelly's motion for a COA with respect to four claims that have yet to be briefed. Before us now is Kelly's application for a COA with respect to seven issues.

II.    STANDARD OF REVIEW

As indicated, Kelly requests a COA from this Court. Section 2253(c)(1) provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . ." Recently, the Supreme Court made clear that "until a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1039 (2003). To obtain a COA, Kelly must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Miller-El*, 123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595

7

(2000). To make such a showing, he must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 123 S.Ct. at 1039 (internal quotation marks and citations omitted).

In *Miller-El*, the Supreme Court reiterated that we "should limit [our] examination to a threshold inquiry into the underlying merit of [the] claims." *Miller-El*, 123 S.Ct. at 1034 (*Slack,* 120 S.Ct. 1595). The Court explained that "a COA ruling is not the occasion for a ruling on the merit of petitioner's claim. . . ." *Id*. at 1036. Instead, a COA ruling "requires an overview of the claims in the habeas petition and a general assessment of their merits." *Id*. at 1039. To make this assessment, a court of appeals "look[s] to the District Court's application of AEDPA to petitioner's constitutional claims and ask[s] whether that resolution was debatable amongst jurists of reason." *Id.* "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id*. If a court of appeals denies a COA by deciding the merits of an appeal, it essentially decides the appeal without jurisdiction. *Id.*

We must be mindful that "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id*. at 1040. As such, we do not decide the merits of Kelly's claims, but only whether he has demonstrated that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id.* (quoting *Slack,* 529 U.S. at 484, 120 S.Ct. at 1604). Additionally, when a district court denies a claim on a procedural ground, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable

8

whether the district court was correct in its procedural ruling." *Id.*

III.    ANALYSIS

A.    DUE PROCESS VIOLATION BASED ON CLAIM OF
ACTUAL INNOCENCE

Kelly first argues that his conviction and sentence constitute a denial of due process because he is actually innocent of the crime. Relying on *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853 (1993), the district court concluded that "[b]ecause clemency can be obtained from the Board of Pardons and Paroles of the State of Texas, actual innocence, by itself, is not a claim for which relief can be granted in federal habeas corpus for someone sentenced to death under Texas law." Finding the claim not cognizable in federal habeas proceedings, the district court denied relief and a COA.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera*, 506 U.S. at 400, 113 S.Ct. 853. Instead, a claim of actual innocence is a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. at 404, 113 S.Ct. 853. Accordingly, we conclude that the district court's conclusion is not debatable among jurists of reason.

Kelly argues that the independent constitutional claim is the due process violation based on the state's awareness of the false testimony it elicited at trial. However, as noted previously, the district court has granted a COA with respect to that particular due process claim. At this point in the appeal, we are addressing only the claims that involve a request for a COA.

9

B.   DUE PROCESS VIOLATION BASED ON PROSECUTORIAL ARGUMENT

Kelly argues that his due process rights were violated by the prosecutor's incorrect argument that Cynthia should not be considered an accomplice with respect to the instant offense.  For constitutional error to have occurred, a prosecutor's improper argument must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471 (1986); *cf. Earvin v. Lynaugh,* 860 F.2d 623 (5th Cir. 1988) (the evidence must be so insubstantial that no conviction would have occurred but for the argument made by the prosecutor).

During closing arguments at the guilt-innocence phase, the prosecutor referred to the jury instructions and stated the following:

> The law in Texas is that if an accomplice testifies, before a Jury can convict, there must be some other evidence to connect the Defendant to the offense charged.  The Court goes on to tell you what an accomplice is.  And we submit, ladies and gentlemen, *Cindy Kelly is not an accomplice because Cindy Kelly did not act with intent to promote or assist in the commission of this offense.*  She did not enter the house with the intent to commit the murder or the robbery.  In fact, Cindy Kelly acted in an attempt to stop what was done.  She attempted to stop the murder of the baby.  She begged this Defendant to leave the baby at a doorstep and to save the baby's life.  The very crime scene itself shows that Cindy Kelly is not a party to this offense because she is the one that left the folded towel under the head of Brenda Morgan in an attempt to comfort the victim. The Court further instructs you that to be a party to the offense, they must be connected to the offense before or during the commission of the offense.  Cindy Kelly, at the order and direction of Alvin Kelly, drove away at his instructions and his direction.  At his order, she helped wipe the car down in Tyler after the capital murder was complete.  She had no intent prior to or during to aid or assist in the commission of the offense.  She just thought this was business as usual when her [sic] and Al went out.  The Court also tells you that mere presence alone does not make a person an accomplice.  Even if there's any question

10

in your mind as to whether Cindy Kelly is an accomplice, the testimony is corroborated and overwhelming by three witnesses – three witnesses who this Defen[d]ant confessed to – Steve Kelly, his brother, Violet Brownfield, and Danny Moore.

(emphasis added).

The record contains evidence supporting the prosecutor's argument that Cynthia was not an accomplice. As such, the argument is a fair comment on the evidence.

Relying on *Creel v. State,* 754 S.W.2d 205 (Tex.Crim.App. 1988), the district court denied relief. In *Creel,* the Court of Criminal Appeals reiterated that without an affirmative act on the part of the witness to assist or encourage the murder, the witness is not an accomplice. *Id.* at 213. Indeed, Kelly points to no evidence at trial that Cynthia committed an affirmative act to assist or encourage the murder of the baby, Devin. We conclude that the district court's resolution of this issue is not debatable among jurists of reason.[9]

### C. EIGHTH AMENDMENT VIOLATION BASED ON PERJURY

Kelly argues that his death sentence constitutes cruel and unusual punishment because it was secured in part through the use of perjured testimony.[10] *See Johnson v. Mississippi,* 486 U.S. 578,

---

[9] In support of his argument, Kelly relies on the Supreme Court's decision in *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103 (1957). There, the Supreme Court held that the petitioner's due process rights were violated when the prosecutor knowingly elicited testimony that gave a false impression of material evidence to the jury. *Alcorta* did not involve a claim of improper prosecutorial argument. To the extent that Kelly is attempting to argue that his due process rights were violated based on the prosecution's knowing use of perjured testimony and failure to disclose exculpatory evidence, as noted previously, those claims are not yet before us.

[10] As previously indicated, the district court granted a COA with respect to Kelly's *due process* claim that his *conviction* was secured in part through the state's use of perjured testimony. Although the instant Eighth Amendment claim apparently is based upon at least some of the same alleged perjured testimony as the due process claim, it involves a separate challenge

11

108 S.Ct. 1981 (1988) (holding that allowing a death sentence to stand that was based in part on a prior conviction that was later vacated violated the Eighth Amendment's ban against cruel and unusual punishment). Kelly asserts that "Cynthia Kelly's admission of culpability in the Morgan killings and now recantation of her testimony regarding Devin Morgan, significantly undermined the reliability of the death sentence imposed . . . ." The Director responds that Kelly has abandoned this claim by failing to cite to any evidence in the state record that supports this claim. Although Kelly's briefing of this issue leaves much to be desired, we decline to deem the claim abandoned in that it appears (from his brief and federal petition) that he is relying on the affidavits of Violet Brownfield (one of Cynthia's sisters) and Nancy Brown (Kelly's sister) to demonstrate that Cynthia perjured herself at trial. The district court denied relief on this claim, concluding that Kelly's evidence did not establish the factual basis underlying the claim.

The affidavit of Violet Brownfield provides that Cynthia confessed to Violet that Cynthia actually killed Jerry Morgan. According to Violet's affidavit, Cynthia confessed that, on the night of the Morgan murders, she heard a gunshot and ran into the house and saw that Jerry Morgan "had" Kelly. Kelly ordered Cynthia to "get [Jerry Morgan] off him." Cynthia then shot Jerry Morgan. The affidavit also provided that Cynthia told Violet that her testimony at trial that Kelly murdered the baby and his mother was truthful. This affidavit was executed on October 2, 1997. However, twenty days later, Violet Brownfield executed another affidavit in which she explained that "when Cindy told me about shooting Jerry Morgan she told me she shot him in her nightmare, not in real life. I did not tell the other investigators about this just being a nightmare, because I was going to try and get custody

_____

to Kelly's death sentence.

of little Alvin."[11]  Violet's second affidavit also provided that the sisters were smoking marijuana when Cynthia told her about this nightmare.[12]

The other affidavit Kelly relies upon in support of this claim is that of Nancy Brown.  In that affidavit, Nancy Brown stated that Cynthia confided the following to Nancy:  "This is between you, me and God.  [Kelly] did not kill that baby."  "They threatened to kill me and Alvin, Jr. if I didn't testify against [Kelly]."  Cynthia further confided to Nancy that Kelly "did commit murder."[13]  Although Nancy's affidavit indicates that Cynthia confessed that Kelly did not kill the baby, the affidavit fails to assert who "actually" killed the baby.  Nancy's affidavit does not challenge the veracity of Cynthia's trial testimony with respect to the murder of the baby's parents.

Obviously, the affidavits of Violet Brownfield and Nancy Brown contradict each other inasmuch as Violet's affidavit provides that Cynthia confessed that Kelly *did* kill the baby (and his mother), but Brown's affidavit provides that Cynthia confessed that Kelly *did not* kill the baby.  Also, Brownfield executed a second affidavit disavowing the assertions she made in her previous affidavit

---

[11]  "Alvin, Jr." or "little Alvin" is the son of Cynthia and Kelly.

[12]  Additionally, Cynthia executed an affidavit in response to Violet's earlier affidavit, stating that although she never told Violet that she killed Jerry Morgan (or anyone else), she did tell Violet that she dreamed she killed a man.

[13]  Brown's affidavit further provided as follows:

> I knew that he had pleaded guilty to the murder of John Ford.
> Cynthia [Kelly] told me that there were a lot of people at the
> Morgan trailer, and that the law was involved.  Cynthia told me that
> she had to testify because she had been threatened and there were
> threats made against Alvin Kelly, Jr. to her.  Cynthia told me that
> she had been threatened with death.  She said she had been called at
> her former home in Michigan and told she would be killed.  Cynthia
> Kelly told me that she was afraid of law enforcement in East Texas.

that Cynthia had killed Jerry Morgan. In response, Cynthia executed an affidavit that corroborated Brownfield's second affidavit.

We are mindful that the conflicting hearsay in these affidavits executed seven years after Kelly's trial is "particularly suspect." *See Herrera,* 506 U.S. at 417, 113 S.Ct. 853. In light of Violet's retraction and the conflict between Violet and Nancy's affidavits, we are persuaded that the district court's conclusion that the affidavits did not establish the factual basis underlying the claim is not debatable among jurists of reason. *Cf. Knox v. Johnson,* 224 F.3d 470, 478 (5th Cir. 2000) (denying Eighth Amendment claim based on false testimony based on state court's finding that the witness did not testify falsely).

        D.     DUE PROCESS AND EIGHTH AMENDMENT VIOLATIONS BASED ON DENIAL OF SUFFICIENT FUNDS TO ADEQUATELY INVESTIGATE AND PREPARE DEFENSE

Relying on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087 (1985),[14] Kelly argues that his conviction and sentence constitute a denial of due process and cruel and unusual punishment because he was denied sufficient funds to adequately investigate and prepare his defense. Kelly's argument is that if the state trial court had granted the requests for adequate funds for investigation, the defense team would have uncovered the impeachment information with respect to Cynthia's testimony. Although we are dubitante that Kelly's argument raises a valid concern under *Ake,* we will assume for purposes of this appeal that Kelly has made a substantial showing with respect to the alleged *Ake* error. Nonetheless, we deny a COA because Kelly has made no substantial showing of prejudice.

_____

[14] In *Ake,* the Supreme Court held that when an indigent defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, due process requires that a state provide a psychiatrist's assistance with respect to this issue. *Id.*

14

Citing *Rey v. State,* 897 S.W.2d 333 (Tex.Crim.App. 1995), Kelly argues that *Ake* error is a structural error and therefore not subject to harmless error analysis. However, in the context of discussing an ineffective assistance claim, we have recognized that subsequent Texas precedent "essentially overruled the prior *Rey* precedent regarding harmless error review of *Ake* claims." *Briseno v. Cockrell,* 274 F.3d 204, 211 (5th Cir. 2001). More importantly, this Court has expressly held that *Ake* error is subject to harmless error analysis. *White v. Johnson,* 153 F.3d 197, 201 (5th Cir. 1998).

During Kelly's state habeas proceedings, the court found that "[t]he amount of monies paid for investigation of [Kelly's] case was $7,392.74 which included a trip to Alaska." The state court further concluded that "[a]ny additional funds would not have found Cynthia Kelly . . . confessing to killing Jerry Morgan or an agreement with the State for Cynthia's testimony."[15]

In support of the instant claim of inadequate funds to investigate, Kelly points to the following statement by trial counsel: "I believe that, had I had access to [Cynthia's sisters Violet Brownfield and Beverly Stemen] through adequate funding prior to the trial, I would have found these individuals and gotten the information that I have now." Likewise, defense investigator Barry Higginbotham's

---

[15] Additionally, the state court found as follows:
> [Kelly] was allowed to depose seven witnesses after he informed the Court he needed additional funds to interview these witnesses. The witnesses included Violet Brownfield and Cynthia May Kelly. A defense witness, Kerry Phillips, was located by the State and he testified at trial for the defense. [Kelly] never requested any additional monies for investigation after September 3, 1991, and [he] did not ask for any continuance based on his need for additional investigation after September 3, 1991. [Kelly] had investigators during voir dire and trial and the court made payment for their time.

15

affidavit provides that: "[H]ad I had access to [Violet Brownfield and Beverly Stemen] through adequate funding prior to the trial, I would have found these individuals and gotten the information that I have now."

More specifically, both Violet and Beverly executed affidavits for the defense investigator providing that Cynthia told them that she shot Jerry Morgan. However, as previously set forth, Violet has executed a subsequent affidavit in which she explained that "when Cindy told me about shooting Jerry Morgan she told me she shot him in her nightmare, not in real life. I did not tell the other investigators about this just being a nightmare, because I was going to try and get custody of little Alvin." Violet's second affidavit also provided that the sisters were smoking marijuana when Cynthia told her about this nightmare.

Likewise, Beverly Stemen,[16] in a deposition conducted on September 10, 2001, contradicted her affidavit by testifying that "I remember [Cynthia] saying very clearly on that point, very clearly that in [Cynthia's] dream she had shot the man." Beverly stated in her deposition that she was angry at Cynthia at the time she (Beverly) lied. Beverly also indicated that she was taking "medications" and went to see a psychiatrist because the medicine "was causing me to do things and say things that weren't of my nature, that were inappropriate."[17]

Accordingly, because both sisters have retracted the impeachment evidence Kelly asserts he would have found with adequate funding, he has not shown that he was harmed by the allegedly

---

[16] At the time of the deposition in September of 2001, Beverly's last name had changed to Frank.

[17] Specifically, the state court found that Beverly was taking the following medications when she had executed the affidavit: "Luvox, Wellbutrin, Cytomel, Trazodone, Methyphaidate, Conazepam, Methpheid, Cyclobenzaabr, Ultram, and Zepharine."

16

inadequate investigative funds. We conclude that the district court's denial of relief with respect to this claim is not debatable among jurists of reason.

### E. INEFFECTIVE ASSISTANCE BASED ON DENIAL OF SUFFICIENT FUNDS TO INVESTIGATE

Kelly contends that he received ineffective assistance of counsel based on the inadequate funds to investigate his case. However, as set forth above, he has made no showing that counsel's performance prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984).[18] Thus, Kelly has failed to make a substantial showing with respect to ineffective assistance of counsel.

### F. DUE PROCESS VIOLATION DURING STATE HABEAS PROCEEDINGS BASED ON STATE TRIAL COURT'S REFUSAL TO RECUSE ITSELF

Kelly argues that the state trial court's erroneous denial of the motion to recuse itself constituted a denial of due process during the state habeas proceedings. The district court denied relief, stating that "[b]ecause there is no constitutional right to state post-conviction review, irregularities occurring during such review do not state a claim for relief in federal habeas corpus." (citing *Millard v. Lynaugh,* 810 F.2d 1403, 1410 (5th Cir. 1987)). We conclude that the district court's resolution of this issue is not debatable among jurists of reason. *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir.1995) (explaining that "[a]n attack on a state habeas proceeding does not entitle

---

[18] Kelly incorrectly argues that the failure to provide adequate funds caused a conflict of interest which relieved him of the burden of proving prejudice with respect to this claim. *Cf. Beets v. Scott,* 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc) (explaining that "*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context").

17

the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotation marks omitted).

In addition to requesting a COA with respect to this claim, Kelly also contends that the trial judge's testimony during the hearing on the motion for new trial with respect to counsel's performance indicates a bias in favor of the State. This bias, Kelly argues, destroyed the integrity of the fact-finding process during his state habeas proceedings with respect to those claims relating to the conduct of trial counsel. Accordingly, he contends that the findings made by the state court during the state habeas proceedings "should not have elevated the AEDPA standard of review." We need not tarry long with this contention. As previously indicated, we are addressing only Kelly's requests for a COA in the instant opinion. Thus, at this point we are not applying the "elevated" AEDPA standard of review. Instead, we are only determining whether the claims are debatable among jurists of reason. *See Miller-El,* 123 S.Ct. at 1041 (explaining that "[o]nly after a COA is granted will a reviewing court determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary").

### G.    VIOLATION OF SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

The Supreme Court has recently reaffirmed the familiar two-prong test for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

18

*(Terry ) Williams v. Taylor,* 120 S.Ct. 1495, 1511 (2000) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052 (1984)).  To demonstrate that counsel was ineffective, a petitioner must establish that counsel's representation fell below an objective standard of reasonableness.  *See id.*  To show prejudice, he must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  *See id.* at 1511-12.

1.      Failure to Properly Examine Cynthia

Kelly argues that counsel rendered ineffective assistance by failing to cross-examine Cynthia with respect to the existence of any agreement she had with the State for her testimony.  During the state habeas proceedings, the state court found that "[t]here was no agreement between the State and Cynthia . . . that she would not be prosecuted for the murders to induce her to testify."

Kelly admits that because Cynthia denied any such agreement during her pre-trial deposition, counsel correctly would have expected her to continue to do so at trial.  Kelly further acknowledges that the prosecutor personally represented to the court that no deal had been made with Cynthia in exchange for her testimony and that the State did not consider Cynthia a codefendant or a co-conspirator.  Instead, according to the State, Cynthia was a witness to the murders.  Nonetheless, Kelly asserts that had counsel asked Cynthia whether she had received anything for her testimony, it would have (at least) raised a question of credibility for the jurors.

The district court assumed *arguendo* that counsel's failure to make this inquiry constituted deficient performance.  With respect to the second prong, the district court "adopted" the state court's finding that there was no agreement between the State and Cynthia that she would not be prosecuted in exchange for testifying against Kelly.  Based on this factual finding, the district court found there was not a reasonable probability that, had counsel cross-examined Cynthia with respect

the existence of any such agreement, the outcome of the guilt or sentencing phase would have been different.

Relying on the affidavits of Kelly's sister Nancy Brown and her husband, Conley Brown, defense investigator Barry Higginbotham, Cynthia's sister, Beverly Stemen, and state habeas counsel Mark Breding, Kelly contends that subsequent investigation has demonstrated that the authorities either: (1) coerced Cynthia into testifying by threatening her life and that of her son; or (2) promised, advised, or lead Cynthia to believe that she would not be prosecuted if she returned to Texas to testify.

Contrary to Kelly's contentions, the hearsay in the affidavits regarding some vague threat by the authorities does not rise to a substantial showing. None of the affidavits provide that Cynthia admitted that she had an agreement with the State. The closest allegation is that representatives of the district attorney's office told Cynthia's sister Beverly Stemen that although Cynthia would not be granted immunity, she would not be prosecuted. Kelly's argument is that Cynthia was not prosecuted even though her sister informed Assistant District Attorney Rebecca Simpson that Cynthia had confessed to shooting Jerry Morgan. However, the state court found that Beverly never had a conversation with Simpson or the District Attorney's Office investigator Russell Potts concerning Cynthia shooting Morgan. Moreover, as set forth previously, in a 2001 deposition, Cynthia's sister Beverly contradicted her previous affidavit by testifying that "I remember [Cynthia] saying very clearly on that point, very clearly that in [Cynthia's] dream she had shot the man."[19] Further, the state

_____

[19] As set forth previously, Beverly stated in her deposition that she was angry at Cynthia at the time she lied. Beverly also indicated that she was taking "medications" and went to see a psychiatrist because the medicine "was causing me to do things and say things that weren't of my nature, that were inappropriate." Specifically, the state court found that Beverly was taking the following medications when she had executed the affidavit: "Luvox, Wellbutrin, Cytomel,

20

court found that Cynthia never told her sisters that she shot Jerry Morgan and that Cynthia's reference to shooting a man was only in the context of a nightmare.

The State's position has been that Cynthia did not participate in the murders and thus she would not be prosecuted. The state court found that District Attorney's Office investigator Russell Potts and Sheriff's investigator Chuck Willeford informed Cynthia that "if it was shown that she participated in the crime she would be prosecuted. She was informed that mere presence at the scene was not sufficient to charge her with the crime."

In any event, the question before us is whether Kelly has made a substantial showing that there is a reasonable probability of a different outcome had defense counsel cross-examined Cynthia regarding any deal she allegedly had with the State. Although defense counsel did not inquire regarding a deal with the State, counsel did question Cynthia's motives while on the stand. Counsel asked Cynthia whether the State had charged her with any offense, and she responded no. On cross-examination, Cynthia admitted that the State paid for her trips between Michigan and Texas and for her stay in Texas. Additionally, the state court found that defense counsel cross-examined Cynthia regarding her decision to speak to law enforcement after the dismissal of a child support lawsuit against Kelly. In view of the evidence against Kelly at trial and the questions regarding Cynthia's motivation to testify, we are confident that Kelly has not shown that the district court's conclusion (that there exists no reasonable probability of a different outcome had defense counsel cross-examined Cynthia regarding any deal she allegedly had with the State) is debatable among jurists of reason.

Kelly also argues that counsel rendered ineffective assistance by failing to cross-examine

---

Trazodone, Methyphaidate, Conazepam, Methpheid, Cyclobenzaabr, Ultram, and Zepharine."

21

Cynthia with respect to the role she played in the murder of John Ford.[20]  Kelly argues that such cross-examination would have disclosed to the jury that Cynthia had far greater involvement in "criminal activities than she admitted at trial."  According to Kelly, this questioning "would have indicated that she was actually an accomplice in the Morgan killings, rather than simply being present and forced to assist at gunpoint, as she claimed at trial."  Of course, as found by the state court during habeas proceedings, had counsel conducted such a cross-examination during the guilt phase, the jury would have been informed that Kelly had committed another murder.  Indeed, Kelly's counsel had filed a motion *in limine* to exclude evidence of extraneous offenses such as the Ford murder.  The district court denied relief on this claim, concluding that Kelly had not met the first prong of *Strickland.*  466 U.S. at 687, 104 S.Ct. 2052.   More specifically, the district court opined that "[c]onsidering that Kelly denied guilt in the Morgan murders, the Court cannot say that a strategy of not admitting to the Ford murder during the guilt/innocence phase of the trial, in order to lessen the chance of jury prejudice, would have been objectively unreasonable."  On appeal, Kelly does not acknowledge, much less challenge, this conclusion.  Accordingly, because cross-examination of Cynthia regarding another murder would have introduced very prejudicial evidence during the guilt phase, we conclude that Kelly has not shown that the district court's resolution of this issue is debatable among jurists of reason.

### 2.     Failure to File Prepared Motion to Transfer Venue

Elizabeth Fulton, who was co-counsel for Kelly's lead attorney Harry Heard, prepared a motion to transfer venue that was never filed.  Under Texas law, to prevail on a motion to transfer

---

[20]  Kelly was serving a sentence for the murder of John Ford at the time the instant, unrelated offense was solved.

22

venue based on unfavorable pretrial publicity, a defendant must establish, among other things, that pretrial publicity was pervasive, prejudicial, and inflammatory. *McManus v. State,* 591 S.W.2d 505 (Tex.Crim.App. 1979); *Demouchette v. State*, 591 S.W.2d 488 (Tex.Crim.App. 1979).

Relying on three affidavits and twenty-seven newspaper articles covering the instant offense, Kelly argues that trial counsel should have filed the motion, and it would have been granted.[21] In support of this argument, Kelly points to two statements made by each of the affiants. The first statement in each of the affidavits reads as follows: "It is my belief that a conspiracy of influential people constituting a dangerous combination against Alvin Kelly that would preclude a fair trial in Gregg County, Texas, exists." The second statement by the affiants reads as follows: "It is my belief that the newspaper accounts that attempt to tie the murder of the Morgan family to the Kentucky Fried Chicken (KFC) murders would also preclude a fair trial in Gregg County, Texas." The apparently unrelated "KFC murders" in the region had received a good deal of media coverage and had not been solved (at least at the time of Kelly's trial).

With respect to the first statement made by the affiants, the district court found that the conspiracy allegations and prejudice against the defendant are vague and conclusory. With respect to the allegation that Kelly was prejudiced by the newspaper articles, the district court found that none of the summaries offered by Kelly indicate that the respective writers attempted to tie the instant murders to the KFC murders. Indeed, all the references found by the district court indicated that the instant murders and the KFC murders were *not* related.[22] Thus, the district court concluded that the

---

[21] The district court assumed *arguendo* that twenty-seven newspaper articles over a six-year period constituted pervasive press coverage.

[22] We also note that the references to the KFC murders were in four articles published in 1984 and one article in 1989. The instant trial was conducted in 1991.

23

state trial court would not have found credible the assertion in the affidavits that the newspaper coverage connecting the instant offense to the KFC murders would have precluded a fair trial.

In his brief, Kelly does not attempt to demonstrate that the district court's conclusions were incorrect. This Court is not persuaded that twenty-seven articles over a time period in excess of six years is pervasive. Moreover, in light of Kelly's failure to show that the conspiracy allegations were more than conclusory or that the newspaper coverage attempted to connect the instant offense with the KFC murders, we are convinced that the district court's resolution of Kelly's claim that counsel rendered ineffective assistance for failing to file the motion to transfer venue is not debatable among reasonable jurists.

### 3. Counsel was Intoxicated During Trial

In the alternative to the above arguments, Kelly argues that no prejudice is necessary because his counsel was intoxicated during trial and a "drunk lawyer is no better than a sleeping one." In *Burdine v. Johnson,* 262 F.3d 336 (5th Cir. 2001) (en banc), *cert. denied,* 535 U.S. 1120, 122 S.Ct. 2347 (2002), this Court held that a defendant's Sixth Amendment right to counsel is violated when that defendant's counsel is repeatedly asleep through not insubstantial portions of the defendant's capital murder trial. Under such circumstances, it must be presumed that the violation prejudiced the defendant. Contrary to Kelly's reliance on *Burdine,* in that case, this Court distinguished intoxicated counsel from sleeping counsel, explaining that sleeping or unconscious counsel could not perform at all for his client. *Id.* at 349. We are bound by precedent to reject Kelly's argument that he need not show prejudice based on defense counsel's alleged intoxication. *See also Burnett v. Collins,* 982 F.2d 922 (5th Cir. 1993) (rejecting claim that counsel rendered ineffective assistance simply because counsel abused alcohol).

24

Accordingly, because Kelly has failed to make a substantial showing of the denial of a constitutional right with respect to each of his claims, we DENY a COA.

DENIED.

The suspension of briefing is lifted and the Clerk is directed to issue a new briefing schedule to allow Kelly to file a brief with respect to the claims that the district court granted a COA and to allow the Director to respond to those claims.