United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 14, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 03-10024

---

RICKY EUGENE MORROW,

                                        Petitioner-Appellant,

                    versus

DOUG DRETKE, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

                                        Respondent-Appellee.

---

Appeal from the United States District Court
For the Northern District of Texas

---

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is an application for a certificate of appealability by Ricky Eugene Morrow, a Texas death row inmate, seeking to appeal the decision of the federal district court denying habeas relief and refusing a COA. Morrow raises three contentions. First, he argues that the district court erred in denying an evidentiary hearing and presuming the findings of the State habeas court to be correct even though it held no hearing. Second, he asserts that the state habeas court committed constitutional error in rejecting

his claim that the state suppressed FBI and Dallas police reports of interviews with prosecution witnesses.  Third, he urges that the district court erred in rejecting his claim that his counsel was ineffective at the guilt-innocence phase of his trial.  We grant the request for a COA on the *Brady* claims and ultimately affirm their denial on the merits.  We deny a COA on the remaining claims.

I

Morrow was convicted of capital murder by a jury in Dallas County, Texas, in 1983 and sentenced to death.  That conviction was reversed on appeal.[1]  He was tried again with the same result.  This second conviction was affirmed on appeal.[2]  Morrow filed his state habeas petition on October 21, 1996, supplemented on January 26, 1999.  Because the judge who presided at the trial had retired, the habeas case was assigned to a visiting judge who denied a request for an evidentiary hearing and recommended denial of relief upon the record as supplemented by affidavits and documents, a recommendation accepted by the Court of Criminal Appeals.[3]  Morrow's federal petition followed on September 13, 2000.  The federal magistrate judge also denied an evidentiary hearing, and on April 9, 2002, filed her recommendations.  The district court in

---

[1] *Morrow v. State*, 753 S.W.2d 372 (Tex. Crim. App. 1988).

[2] *Morrow v. State*, 910 S.W.2d 471 (Tex. Crim. App. 1995).

[3] There was one exception.  The Court of Criminal Appeals did not accept a finding by the trial court that Morrow had waived his claim of ineffectiveness because it was not properly briefed.

2

turn adopted the sixty-five page report of the magistrate judge, denying relief and a COA.

II

A

Unless a COA is granted, this Court lacks jurisdiction to hear this appeal.[4] The standard is whether Morrow "has made a substantial showing of the denial of a constitutional right."[5] This standard "includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."[6]

The COA determination "requires an overview of the claims in the habeas petition and a general assessment of their merits" but not "full consideration of the factual or legal bases adduced in support of the claims."[7]

B

As for the merits, under section 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any

---

[4] 28 U.S.C. § 2253(c)(1)(A) (2001).

[5] *Id*. § 2253(c)(2); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983); *Dowthitt v. Johnson*, 230 F.3d 733, 740 (5th Cir. 2000).

[6] *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (internal quotations and citations omitted); *Dowthitt*, 230 F.3d at 740.

[7] *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1039 (2003).

3

claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[8]

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.[9] Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case.[10]

A federal habeas court's inquiry into reasonableness should be objective rather than subjective, and a court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

---

[8] 28 U.S.C. § 2254(d) (2001).

[9] (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hernandez v. Johnson*, 248 F.3d 344, 346 (5th Cir.), *cert. denied*, 534 U.S. 1034 (2001).

[10] *Williams*, 529 U.S. at 407-09; *Hernandez*, 248 F.3d at 346.

4

established federal law erroneously or incorrectly."[11]  Rather, federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable.[12]  However, "an unreasonable application of federal law is different from an *incorrect* application of federal law."[13]  In other words, habeas relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion."[14]  This court has also held that it is the state court's "ultimate decision" that is to be tested for reasonableness, "not every jot of its reasoning."[15]

Additionally, section 2254(e)(1) also requires federal courts to presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."[16]

C

For reasons we will explain, we deny Morrow's request for a certificate of appealability on his claim that the district court

---

[11] *Williams*, 529 U.S. at 411; *see also Tucker v. Johnson*, 242 F.3d 617, 620-21 (5th Cir.), *cert. denied*, 533 U.S. 972 (2001).

[12] *Williams*, 529 U.S. at 411; *Martin v. Cain*, 246 F.3d 471, 476 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).

[13] *Williams*, 529 U.S. at 410.

[14] *Id*. at 410-11 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)).

[15] *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001), *cert. denied*, 535 U.S. 982 (2002).

[16] 28 U.S.C. § 2254(e)(1).

erred in denying an evidentiary hearing and in presuming the state court findings to be correct, as well as his claim of ineffective assistance of counsel. We grant the certificate for Morrow's claim that the State suppressed FBI reports and interviews with prosecution witnesses. However, we reject this claim on its merits and affirm the judgment of the district court insofar as it denied Morrow relief on this claim.

III

The federal district court described the robbery and murder as follows:

> Trial testimony adduced the following facts regarding the events at issue. In the late morning of January 19, 1982, Morrow and [Linda Ferguson Morrow][17] proceeded to a laundromat so that Ferguson could do their laundry while Morrow went to a pawnshop to purchase a radio. He later returned for Ferguson and they in turn went back to the pawnshop ostensibly to purchase a television. They instead purchased two handguns – a smaller .25 pistol and a larger .38 revolver. After purchasing the weapons, they proceeded to a mall to purchase ammunition.
>
> Ferguson and Morrow arrived at Metropolitan [Savings] at around 4:15 p.m. Morrow went inside the bank and "started screaming and cursing and hollering and directing profanities at everyone in the bank and demanding the money." Joena Bailey Shipley, Jean Cullum Blum, W.L. Miller, and Carol Fritchie were working at Metropolitan at the time of the robbery. Morrow exited the bank with a sack of money, including coins. As he exited, the sack ripped and his gun discharged. He stopped to retrieve the dropped money. Two bystanders, Louis Wong and Bo Holmes, witnessed a man leaving the scene with money falling from a ripped sack. No one disputes that the man they saw was petitioner Ricky Morrow.

---

[17] Ferguson married Morrow after the crime occurred.

John Norton, a Dallas police officer at the time of the robberies, interviewed witnesses at Metropolitan. After the Metropolitan robbery, Dallas police officer K.C. Edmonds interviewed Shipley, Blum, Miller, and Fritchie. Agent Nelson Borrero of the Federal Bureau of Investigation also interviewed Blum.

After leaving Metropolitan, Morrow and Ferguson arrived at First Texas [Savings] between 4:30 and 5:00 p.m. As Morrow entered First Texas he approached Kathy Knoebber Crouse at her desk. When Mark Frazier, another bank employee, asked Morrow if he needed assistance, Morrow "started screaming and ranting and raving and cursing and hollering it was a robbery." He led Frazier at gunpoint to Tammy Roy's teller window and pointed one pistol at her and another pistol at Frazier. After getting a sack of money from Roy, Morrow shot and killed Frazier and exited the bank.

Jo Brown, Operations Supervisor at First Texas, witnessed the events at First Texas on January 19, 1982. Nancy Galloway, another employee of First Texas, also witnessed the events of that date. Jan Noble, a real estate agent with an office in the same building at First Texas, witnessed Morrow and Ferguson leave the scene in their vehicle.

After robbing First Texas, Morrow and Ferguson proceeded to the Park Cities Inn and rented Room 311. Richard A. Acree, a police officer then employed by the University Park Police Department, spotted their vehicle at the inn. He spoke with Sherry Baker, the clerk-receptionist for the inn, and ascertained that Morrow and Ferguson were in room 311. He called for assistance and several units arrived on the scene soon thereafter.

Numerous law enforcement officers from the FBI, Dallas Police Department, and University Park Police Department arrived at the inn, converged on Room 311, and demanded that Morrow and Ferguson surrender. FBI Agent Thomas Yunessa, armed with an assault rifle, and Dallas Police Officer P.T. Barnum, armed with a shotgun, crouched behind a toppled coke machine in the hall outside the room. Officers Edmonds, Luke Robertson, and Harold Rice, as well as Detectives Charles Hallam, John Landers, and Jack Baird of the Dallas Police Department, were also present at the inn. Ferguson voluntarily surrendered. Morrow then fired his .38 revolver. Law enforcement

officers fired weapons and Morrow subsequently surrendered.

Special Agent Richard T. Garcia of the FBI interviewed Crouse after the robbery and shooting at First Texas. Special Agent H. Lamar Meyer interviewed Nancy Galloway and Jan Noble regarding the events at First Texas.

IV

We must deny a COA for Morrow's first claim that the federal district court erred in applying a presumption of correctness to the state habeas findings because they rested on the papers filed and not on testimony at an evidentiary hearing. The presumption of correctness under AEDPA is accorded adjudications by state courts. If the state has rejected a petitioner's habeas claim on its merits, it has adjudicated the claim. The AEDPA requires that we presume correct the habeas court's findings of fact unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."[18] This is so even if the hearing was a "paper" hearing and may not have been full and fair.[19]

V

Morrow contends that the state did not disclose evidence favorable to his defense in violation of its duty set out in *Brady v. Maryland*,[20] and *Kyles v. Whitley*,[21] and that it used false

---

[18] 28 U.S.C. § 2254(e)(1).

[19] *Valdez v. Cockrell*, 274 F.3d 941, 950-51 (5th Cir. 2001), *cert. denied*, 537 U.S. 883 (2002).

[20] 373 U.S. 83 (1963).

[21] 514 U.S. 419 (1995).

8

testimony knowing it to be false, a denial of his due process rights as described in *Giglio v. United States*.[22] Morrow did not seek a certificate of appealability on the latter claim from this court. We read this assertion in his brief as a variation of his request for a certificate of appealability on his second issue, "whether the state suppressed favorable evidence that denied appellant due process of law and a fair trial." To the extent it is anything more, it is not before us and we will not treat it as a separate issue.

A

A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial."[23] It is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[24] It is not whether the result would have been different. Rather, it is whether given the non-disclosures of material evidence the verdict is less worthy of confidence. In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it. Rather, the prosecutor "has a duty to learn of any

---

[22] 405 U.S. 150 (1972).

[23] *United States v. Agurs*, 427 U.S. 97, 108 (1976).

[24] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

favorable evidence known to the others acting on the government's behalf in the case, including the police."[25]

With these general and settled principles, we turn to the specific contentions.

B

The claim of suppressed or undisclosed evidence relates to three sets of fact questions at the trial:

1) Morrow's mental state at the time of the two robberies, specifically whether he was "high" on drugs or alcohol.

2) The manner of the fatal shooting inside the bank as it bore on whether it was intentional and deliberate.

3) Relatedly, the manner of Morrow's flight from the First Texas Bank after the fatal shooting, specifically as it bore on his emotional state.[26]

1

As detailed in its opening statement and voir dire, the defense maintained that Morrow was guilty only of felony murder, not capital murder, because he was so intoxicated on drugs and alcohol that he could not form the intent to kill and that the shooting of Frazier was an accident. The prosecutor's response, as reflected in his summation, was that Morrow might have been "high,"

---

[25] *Kyles*, 514 U.S. at 437.

[26] That is, whether he was upset and crying or cavalier -- "satisfied," "demonstrated a don't care attitude" or "laughing."

10

but it was on "fear" or a "murder high."  With these opposing stances at trial, the State called Jean Blum, an employee of Metropolitan Bank, who testified that Morrow was not intoxicated on drugs or alcohol.  She denied telling police officers a different story, explaining that she told Officer K.D. Edmonds that Morrow was "high like on adrenaline," "excited with the thrill of what was going on."  Joena Bailey Shipley, an employee of Metropolitan, testified that Morrow was not drunk out of his senses, that he did not stagger or slur his words.  Officer Jack Baird, present at Morrow's arrest, testified that Morrow appeared "high" on drugs or adrenaline, and prompted by the prosecutor, accepted that Morrow could have been on a "murder high."

Morrow's *Brady* argument here is that the following five documents were not disclosed:

> an FBI report reflecting that Jean Blum told Agent Nelson Borrero that Morrow, while at Metropolitan Bank, had bloodshot eyes, a "wild look," and appeared to be "on drugs" or intoxicated;

> an FBI report reflecting that Jo Brown told an agent that Morrow was "high" at First Texas;

> an FBI teletype reflecting that witnesses at Metropolitan Bank said that Morrow was "high" on drugs or alcohol;

> an FBI memo reflecting that witnesses at both banks said that Morrow was "high" on drugs or alcohol; and

> an FBI report prepared by agent David Cutcomb reflecting that Morrow had slightly slurred speech and "wide" eyes when he was arrested.[27]

---

[27]The state does not contest its duty to disclose these documents on the basis that they were possessed by the FBI.  We

Morrow argues that with these documents he could have impeached these witnesses regarding the level of Morrow's intoxication; that they were material to Morrow's intent to kill Frazier; that the state habeas judge erroneously narrowed the prosecutor's duty of production to admissible evidence and was clearly in error in crediting a state prosecutor's affidavit that the documents were produced over affidavits of defense counsel in both trials that they were not.

An FBI report of Agent Borrero indicates that Ms. Blum told him that Morrow had "somewhat bloodshot" eyes and that he "[a]ppeared to be on drugs or intoxicated, and had a wild look in his eyes; a very excited person."[28] An FBI agent commented that Jo Brown, a bank teller, indicated that Morrow was "high," "shouted obscenities," and "ranted and raved."[29] FBI Agent Cutcomb recorded that Morrow "spoke in a manner such that his words were slightly slurred" and that he "widened his eyes while speaking."[30] An FBI teletype records that unidentified witnesses at Metropolitan

---

accept that there was a duty of disclosure on the facts of this case but express no opinion in that regard. *See United States v. Antone*, 603 F.2d 566 (5th Cir. 1979); *Moon v. Head*, 285 F.3d 1301,1309-10 (11th Cir. 2002); *United States v. Upton*, 856 F.Supp. 727, 749-50 (E.D.N.Y. 1994).

[28]Habeas Exhibit C.

[29]Habeas Exhibit D.

[30]Habeas Exhibit G.

believed Morrow to be high on drugs or alcohol.[31]  Finally, an FBI memorandum records that unidentified "[w]itnesses at both bank robberies advised that [Morrow] was apparently high on drugs or alcohol at the time of instant bank robbery."[32]

The magistrate judge below concluded that the exhibits were not material by the measures of *Brady* and *Kyles*; that "the jury would have reached the same result had they considered the exhibits related to the intoxication issue."  Her opinion recounts at length the extensive testimony regarding intoxication, including that of Morrow, Officer K.C. Edmonds, Officer Norton, and others. Significantly, Officer Edmonds interviewed witnesses Joena Bailey Shipley, Jean Cullum Blum, W.L. Miller, and Carol Fritchie at Metropolitan.  The variances between their statement to Edmonds and at trial was explored by counsel.  Ultimately, the magistrate judge concluded that the "allegedly withheld documents...[were]...merely cumulative to the intoxication issue and not material within the meaning of *Brady* and its progeny."  We agree.

To place the issue of intoxication into its factual setting at trial, it is important that Morrow plead guilty to the robbery of the Metropolitan Savings & Loan and to attempted capital murder of the police officers who arrested him at the Park City Inn.  These pleas of guilty were to offenses having an element of

---

[31]Habeas Exhibit E.

[32]Habeas Exhibit F.

13

intentionality and were put before the jury by Dan Hagood, the prosecutor, in his cross-examination of Morrow. This left Morrow confessing that he was sober enough in his first robbery, minutes before the fatal shooting in the second robbery - where he claims he was stoned. Yet he was again sufficiently sober a short while after the homicide to have the intent to kill arresting officers. With his claims of intoxication now tightly sandwiched between another bank robbery and shooting, Morrow attempted to explain in his trial testimony that he did not intend to shoot Frazier; rather, concerned that the cocked .38 pistol he had trained on Frazier at a distance of two feet might accidentally discharge, he testified that he attempted to uncock the gun by lowering the hammer with his thumb while releasing it by pulling the trigger. The detailing at trial of his thought processes while attempting this maneuver was plainly in tension with his claim that he was so drunk that he had no intent to kill and even more so his pleas of guilty to the first robbery and to attempting to kill the arresting officers a short while after the second robbery with its fatal shooting. Evidence of some impairment is relevant to the claim that the shooting was accidental, but evidence that he was so drunk as to lack cognitive awareness was undercut by his detailed explanation of how the shooting occurred. On this record accidental shooting was Morrow's only arguably plausible defense to capital

14

murder.[33]  Perversely, the government's contended-for description of his condition - that he was pumped up on adrenaline - lies more comfortably with Morrow's claim that he did not intend to fire at all, and that Morrow was high on something was hardly an issue at trial.

We turn now to the second set, the manner in which the shooting occurred.

2

Morrow complains that two FBI reports and a supplemental report of the Dallas Police Department were not disclosed.[34]  Morrow urges that disclosure of these reports would have enabled him to impeach the testimony of Brown and Crouse that Morrow's shooting of Frazier appeared deliberate.

The State called only one witness, Jo Brown, to describe the shooting of Mr. Frazier. Brown testified that when Morrow entered the bank, Frazier approached him, asking if he could be of help; that Morrow had a big gun in his right hand and a smaller one in his left. Brown's account of the shooting was graphic, telling the jury that Morrow picked up the money bag with his left hand, turned his head slightly, raised the .38 pistol very deliberately and shot Frazier in the face as he stood two feet away. In her words, it

---

[33] The trial judge charged the jury on Morrow's defense of voluntary intoxication, although he was not entitled to it under state law.

[34] Habeas Exhibits D & I, and a supplemental report of the Dallas Police Department, Habeas Exhibit T.

"was as deliberate as anything I have ever seen"; there was a "slight pause" before he pulled the trigger. Finally, she testified that Morrow "turned around and very calmly walked out with a springy little step right up on the balls of his feet with a smirky little look on his face" – a "satisfied look," and an "I don't care attitude."

Two of the reports discuss Brown's observations.[35] According to Morrow, the Dallas Police Department report compromises her trial testimony because it does not state that Brown saw the shooting. He also argues that the FBI report contains the notes that he could have used to impeach Brown regarding her testimony on how the shooting occurred.[36]

The magistrate judge found that these three reports were not material because none of them indicated how the shooting occurred. We agree. That the exhibits lacked the same level of detail as her trial testimony did not make them material.

The defense called Kathy Knoebber Crouse. According to an FBI report, Crouse told Agent Garcia that Morrow held the smaller gun in his right hand and the larger one in his left and she did not recall which gun fired the shot and did not know where the money bag was, whether the money bag was on the counter or in Morrow's

---

[35]Habeas Exhibits D and T.

[36]Habeas Exhibit D.

16

hand when the shot was fired.[37]  Although not completely clear, Crouse's trial testimony suggests that Morrow fired the gun in his right hand and the gun in his left was the smaller one.

> Q.   Okay.  So he reaches into that opening with his left hand and that is to grab the money bag, right?
>
> A.   Yes.
>
> Q.   And that gun is still right here, isn't it?
>
> A.   Yes, it was.
>
> Q.   Okay.  And all sort of in one movement – all in this one movement, the gun was fired, wasn't it?
>
> A.   No, he reached forward and then he leaned back and as he was standing, he raised his arm and his hand went from being down at waist level up to Mark's head and he shot him.

As we have recounted, Morrow testified at trial that the gun discharged accidentally as he tried to uncock the hammer on the gun in his right hand while he reached for the bag of money with his left; that he was hysterical and crying when he returned to his car.  Officer Rice testified for the State in rebuttal that after proper warnings, he interrogated Morrow who told him that he shot Frazier when he pulled a lighter from his pocket which he mistook for a pistol; that Morrow never suggested in the interview that the shooting was accidental.

The magistrate judge concluded that any inconsistencies between the documents not produced and the trial testimony were not material alone or collectively.  We agree.  That Crouse stated in

---

[37]Habeas Exhibit I.

the report that Morrow held the smaller gun in his right hand and the larger in his left, but reversed this description during trial is a minor difference at best, unlikely to affect the verdict. The other inconsistencies between the report and Crouse's trial testimony are similarly inconsequential. Significantly, nothing in the report casts doubt on Crouse's testimony that the shooting did not appear accidental. Even if Morrow had cross-examined Crouse based on the report, there is no reasonable probability that the outcome would have changed. We turn to the third set, the manner in which Morrow departed First Texas Bank.

3

Morrow claims that the State failed to disclose three FBI reports[38] and an FBI teletype report[39] material to the manner in which he departed First Texas. Relatedly, Morrow claims that a supplemental offense report of Dallas Police Officer Leslie Myer[40] and an FBI report of Agent Lamar Meyer[41] were material to the testimony of Jan Noble, a trial witness who testified about Morrow's departing in an automobile and his demeanor at the time.

The magistrate judge found, and we agree, that the FBI teletype report - an account of a witness who observed Morrow run

---

[38] Habeas Exhibits D, I, and J.

[39] Habeas Exhibit E.

[40] Habeas Exhibit T.

[41] Exhibit K.

18

from the bank and enter a late model Oldsmobile - was not material because it did not ascribe the report to an identified witness; that both witnesses to events immediately outside Metropolitan Savings and Loan, Wong and Holmes, testified that Morrow ran from the bank to the car.

The other two documents are more problematic. The reports of Agent Meyer's interview of Nancy Gallaway[42] and an FBI report of Kathy Crouse's statement[43] are not fully consistent with their trial testimony. Both told agents that Morrow ran out the front door of First Texas and at trial testified that he just walked out, not looking perturbed. But the difference would have offered little to the defense. The other evidence, notably Morrow's own testimony, was that Morrow walked from the door.

Finally, Morrow points to additional reports of Special Agent Lamar Meyer that were not disclosed. The first report was that:

> Jan Noble works in the office suite 240 that is above the bank and she was able to look out on Berkshire and observe the male AP [arrested person] get into a red and white vehicle, she wrote down the partial license number of SWY.

The second report of Meyer made on the date of the offense[44] reads as follows:

> Noble stated that her place of business is located above the First Texas Savings Association on the third floor,

---

[42] Exhibit J.

[43] Exhibit I.

[44] Habeas Exhibit K.

19

and that [at] approximately 4:40 p.m. she left her office and was outside the building unlocking the door of her personal automobile parked near the front entrance to the First Texas Savings.  Noble continued that before she could enter her car she observed an automobile pull out very fast from in front of the Savings Association front door and headed in her direction.  As the vehicle passed, traveling very rapidly, she saw a woman driving and a white male seated in the passenger side.  She described the white male as being in his late twenties or early thirties, with brown curly hair.  She could not further describe the person driving other than being a white female.  She described the vehicle as a red, older car with a white top, bearing Texas license plate SWY.  Noble stated that she could not recall the last three digits of the license plate.

Jan Noble testified at trial that she worked as a realtor in the bank building and was leaving for her car when she heard a shot.  She got into her car, arranged her things, and then learned as she looked back that a car blocked her exit.  The male passenger bent down as if he were putting something down or picking something up; when he looked up, their eyes met, and he was laughing and smiling, which "chilled" her.  She watched him for a brief period, perhaps 30 to 60 seconds, until the car entered traffic.  Because the car "whipped around" in a dangerous manner, she felt that something was wrong and obtained a partial license plate number.  When she arrived at her destination, having seen police cars traveling toward the scene with flashing lights, she called First Texas, learned of the robbery, and went to the bank to describe the car to the officers.  On the following day, she identified a photo of Morrow as the man she had observed.

20

Keith Jagmin, defense counsel, cross-examined Noble in detail about what she had seen and her opportunity to distinguish laughter from crying. He developed that Ms. Noble in testimony in another trial had difficulty identifying Morrow although she had identified him from a picture display shortly after the robbery.

In assessing the materiality of the FBI reports of their interview of Jan Noble, it bears mention that the State placed great value on Noble's testimony. Her testimony was accented in the State's summation at both the guilt and punishment stages of the trial. In his summation at the guilt stage, the prosecutor reminded the jury of the detailed cross-examination of Noble, referring to the "contempt in his [Jagmin's] voice" as demonstrating belief that Noble was either mistaken or a liar. The prosecutor concluded that she did not forget what she saw and probably never would. Defense counsel responded that he was not saying that Noble was a liar, only that she was wrong, as Morrow was crying rather than laughing. That did not end it. In rebuttal, another prosecutor argued:

> Why the goal line stand with Jan Noble? Well, she is so critical to the defense because she tells you everything you need to know about Ricky's true character. If you believe Jan Noble, this man is a dead man. She tells you everything you need to know about Ricky Morrow. She tells you that he obtained pleasure, it was a thrill, it was fun, it was something to laugh about, leaving that boy dying in his own blood there on that floor.

This prosecutor then repeated that the defense could not permit the jury to believe Noble because she spoke "so much about [Morrow's] character."

Summing up at the punishment stage, the prosecutors argued that Noble's testimony showed that Morrow took pleasure in the murder, that he acted deliberately while in full control of his faculties, and that he shot Frazier "because he wanted to kill him, because he rejoiced in killing him, because he took pleasure in killing him."

The magistrate judge concluded that withholding these exhibits violated no duty of disclosure. [45] She explained:

> Although the report of Officer [Leslie] Myers appears to indicate that Noble made her observations from her office and such indication is contrary to her trial testimony and [H. Lamar] Meyer's FBI report, the Court does not find this discrepancy material to Morrow's defense. Morrow himself testified that he believed that "no doubt" Noble "was in the parking lot and no doubt she was backing up, no doubt she was looking back, as she said." In addition, the FBI report which indicates that Morrow's "vehicle passed" Noble "traveling very rapidly," is not

---

[45] The state does not concede that the documents relating to Noble's testimony were not disclosed. The state habeas judge adopted the state's proposed finding that these documents were produced, resolving the conflict between the affidavits of defense counsel and the prosecutor in favor of the state. This finding taxes the deference we are mandated to accord state adjudications including credibility findings by judges who have never heard any evidence in the case. It is, however, the law of this circuit. If the exhibits were produced as urged by the State and found by the habeas court, the claim becomes that defense counsel was ineffective in not making use of them to impeach Jan Noble. This potential collision of prosecution theories perhaps explains the State's reluctance to rest on the finding that they were produced. That they were not material would defeat both the *Brady* and ineffectiveness of counsel claims.

22

inconsistent with her trial testimony that when Morrow's vehicle left the scene, it "went forward very rapidly." Noble mentioned twice at trial that the vehicle moved away quickly. More importantly, the fact that the reports do not mention Noble's observation of Morrow's demeanor does not render them inconsistent with her trial testimony. The reports do not indicate that she did not observe Morrow's demeanor[;] they simply do not address the issue at all.

The state also argues that the documents at best were relevant to the punishment phase and given the nature of the charged crime and Morrow's criminal record, including his record in confinement post-trial, the failure to produce could not have shaken confidence in the outcome – the death sentence.

VI

We ultimately agree with the State and the federal district court that no *Brady* violation has been shown. Viewed singly and cumulatively, the documents assertedly withheld were not material in the sense of *Brady* as explicated in *Kyles* and were at best cumulative.

That said, as we move from consideration of each isolated piece of evidence and survey the entire trial picture, the cumulative impact of the failure to produce the documents held by the FBI - assuming that there was a failure - has given us pause. The most powerful argument for their materiality is that they would have given defense counsel the ability to remind the jury of the frailty of recollection of startling and frightening events; that it should be cautious in resting its life or death decision upon an

23

unskeptical acceptance of such recollection – coming years after the events.

The materiality of the documents – what use might have been made of them and its flip side, the injury suffered by their absence - must in the end be a judgment call, resting on a firm grasp of the entire record and an intimacy with the factual play, the narrative drama of the trial. Inevitably, how we see it is a product of our mastery of the details and our own experience.

In widening our view to bring the full trial into focus, we return to two aspects of the claim of non-production. The first is the testimony of Jan Noble – that Morrow sat in his car outside the First Texas Bank laughing. The prosecutors wanted that testimony – a curtain closer to a brutal murder. Defense counsel, sensing its bite, fought to contain it, skillfully developing Ms. Noble's earlier misidentification. The withheld documents could also have pointed out that the reports of the FBI of her account, brief as they were, made no mention of Morrow's demeanor. That the quick explanation may well have been that she was not asked about it would not drain the omission of all worth. It had residual value. And if we locked our gaze here, Morrow's claim that the documents were material would have purchase. But there was much more -- more than Morrow's able trial counsel could fend off. Morrow's effort to portray himself as a robber who would not shoot – distraught over the "accidental" shooting – cannot survive his criminal history, including his plea of guilty to attempted capital murder

24

of the officers trying to arrest him within hours of the shooting of Mr. Frazier at First Texas and his plea of guilty to robbing the Metropolitan Savings & Loan minutes before moving on to First Texas.  Nor for that matter does a robber who would not shoot need to so carefully load and practice firing his weapons.

Our review of this trial has left us with the firm view that any failure by the State prosecutor to obtain and produce the FBI materials in no measure lessens our confidence in the jury's decisions.  Morrow has been well represented by court-appointed counsel in two trials and in habeas proceedings, including those before this court.  Two juries have spoken and many courts.  In short, Morrow has received his due as a person charged with a capital crime.

We reject Morrow's *Brady* claims on their merits and refuse a certificate of appeability for his two remaining contentions for essentially the reasons found by the magistrate judge and adopted by the district court.

AFFIRMED IN PART AND DISMISSED IN PART.