**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 4, 2006**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 05-70010

GUY STEPHEN ALEXANDER,

Petitioner - Appellant,

VERSUS

NATHANIEL QUARTERMAN, Director,
Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent - Appellee.

Appeal from the United States District Court
for the Southern District of Texas
(03-CV-5070)

Before DAVIS, SMITH and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

Petitioner Guy Stephen Alexander appeals the district court's denial of his writ of habeas corpus. Because we conclude that the state court's resolution of Alexander's ineffective assistance claim was not contrary to clearly established federal law and was not based on an unreasonable determination of the facts, we affirm the denial of Alexander's

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

habeas petition.

I.

A.

The Court of Criminal Appeals summarized the relevant facts of the crime in its opinion on direct appeal:

> Wilma Wofford, an elderly lady was murdered on the morning of January 24, 1989, in Houston. The deceased had suffered several lacerations to the head that were consistent with being struck by a blunt instrument. Portions of a broken brick were found near her body. Around the deceased's neck was an electrical cord, another cord, and a cloth belt. Her death was a result of asphyxiation. The deceased's automobile was missing. Other personal property missing from the residence included two rings and some silver coins, which were sold to a pawnshop. These items were sold by [Alexander] on January 24, 1989. Police ultimately recovered the television and binoculars. Four fingerprints and three palm prints, all matching [Alexander's] were found in the deceased's premises. A blood-stained print of a tennis shoe, matching [Alexander's] tennis shoe, was found on the floor of the deceased's premises.

> On January 26, 1989, Officer Kenneth Broadis and two other officers of the Jackson County Sheriff's Department in Mississippi observed [Alexander] in a fast food restaurant in Moss Point, Mississippi. [Alexander] appeared to be acting suspiciously. A short time later Officer Thomas Lamb of the Jackson County, Mississippi Sheriff's Department was on patrol when he observed [Alexander] driving the deceased's automobile in excess of the speed limit. Lamb had been advised that the automobile was stolen and was being sought in connection with a homicide case in Houston, Texas. After a brief pursuit, Lamb pulled the vehicle over and apprehended [Alexander]. In [Alexander's] possession were several of the deceased's credit cards. In the automobile police discovered the deceased's typewriter and a set of keys, one of which fit the deadbolt lock at the deceased's home.

> On January 27, 1989, [Alexander] gave a written statement in which he admitted killing the deceased. In the statement he detailed exactly how he had murdered her and what property he had taken from her. At [Alexander's] trial the statement was read to the jury over [Alexander's] objection.

2

<u>Alexander v. State</u>, No. 70941, slip op. at 1-2.

B.

In August 1989, Alexander was convicted and sentenced to death for the capital offense of murdering Wilma Wofford in the course of committing or attempting to commit robbery. The Texas Court of Criminal Appeals affirmed that judgment and the United States Supreme Court denied certiorari. Subsequently, Alexander filed petitions for state habeas relief which were denied. Alexander filed his federal habeas petition raising four claims for relief. The district court concluded that Alexander had received all the protections the constitution requires. It granted the Director's motion for summary judgment, and denied Alexander's petition for habeas relief and a certificate of appealability ("COA"). Alexander sought COA from this court on two issues: the denial of his claim pertaining to the trial court's refusal to admit certain testimony of Dr. James Marquart during the sentencing phase, and the denial of his claim of ineffective assistance of counsel at the sentencing phase. We concluded that reasonable jurists could debate whether or not additional evidence of Alexander's background was available to and accessible by trial counsel and whether that evidence could have influenced the jury's penalty decision. Accordingly, we granted COA on Alexander's ineffective assistance of counsel claim. COA was denied on Alexander's other claim. <u>Alexander v. Dretke</u>, No. 05-70010, 2005 U.S. App. LEXIS 23325 (5th Cir. October 27, 2005). The facts relevant to this claim follow.

C.

At the punishment phase of Alexander's trial, the state presented evidence that

Alexander had severe behavioral problems that originated in childhood. Neighbors were called to testify about his behavior as a child, including threatening and inappropriate sexual behavior. Alexander's problems were also documented in school records and the testimony of the school psychologist. Alexander's criminal acts were described by various victims, including home burglary, driving with a suspended license, and attempted car jacking. The state also presented evidence of Alexander's antisocial behavior in job situations and evidence of violence while in jail. Alexander's history of drug addiction was covered including evidence that he dropped out of a rehabilitation program in 1988 and did not enroll in the program available to him while awaiting trial in his capital case.

The defense presented testimony of Alexander's father (Lee) that Alexander was placed in special education classes early in his education because of inattentiveness and boredom. Lee testified that there was nothing unusual about Alexander compared to the other children and that his only arrests were for traffic violations. Lee explained that Alexander married, became a father and worked with his wife's uncle repairing air conditioning units. After Alexander and his wife separated, Alexander moved home to be with his terminally ill mother, whose death upset him. After his mother's death, Alexander became withdrawn emotionally from the family and, after revealing his drug use, attempted treatment. Alexander's father said that Alexander later stole his car. Alexander's sister testified that theirs was a close family and that she saw no problems with him or his behavior at home or school.

The defense presented two witnesses who testified about education and drug treatment

programs available in Texas jails.  The defense also presented three expert witnesses.  Dr. Quijano, a clinical psychologist, testified about the effect of prison life on inmates.  He stated that the discipline and programs available to inmates generally evoke positive results.  Dr. Webster, a forensic psychologist, evaluated Alexander through interviews with him and his family members, reviewed his school records and confession and administered various tests. School records reflected that Alexander walked with his upper body thrust forward with his arms held out to the sides.  Dr. Webster testified that although Alexander is not mentally retarded, he suffers from depression, low self esteem, frustration, immaturity, borderline dependent antisocial personality disorder and below average thinking and reasoning abilities. Her evaluation also indicated dysfunction in the family, a propensity for chemical abuse problems, she set his maturity at an adolescent level.  She stated that the single biggest event in Alexander's life was the death of his mother.  He told her that he thought his father was unfair and unkind and that the isolation of his mother after her diagnosis of cancer hastened her death. Dr. Webster also relayed that Alexander expressed remorse for the crime.  He told Webster that he had been using drugs since the age of 16 and was on drugs when he committed the murder.  Dr. Webster opined that the structure of prison life would help many of Alexander's problems.

Dr. Rustin, an addiction medicine specialist, testified that Alexander had been a heavy abuser of marijuana, alcohol, cocaine, methamphetamine, Quaaludes, LSD, and nicotine, some since age 13.  He also testified about the effects of such abuse and testified  that Alexander had a chance at recovery with programs offered in prison. The testimony of a

fourth expert witness, Dr. Marquart, was excluded by the trial court. Dr. Marquart would have testified that juries cannot predict with any accuracy the future dangerousness of a capital murderer. We denied COA on the issue of the exclusion of Dr. Marquart's testimony.

At Alexander's state habeas hearing, he relied heavily on the 60 page affidavit of Dr. Cunningham. Dr. Cunningham summarized the findings of the post conviction investigation and set forth in detail the areas that he felt defense counsel failed to investigate and present at trial. Dr. Cunningham concluded that the defense failed to put forward information regarding the following adverse developmental factors affecting Alexander:

> disturbed family of origin,
> genetic susceptibility to drug and alcohol dependence,
> cocaine and methamphetamine abuse,
> orthopedic birth injury and subsequent uncorrected disability,
> parental medical neglect,
> significant psychological disorder in childhood,
> developmental intellectual deficits and learning difficulties,
> peer isolation, alienation and rejection,
> traumatic sexual exposure and precocious onset of puberty, and
> inadequate parental supervision and structure.

This report will be discussed in greater detail later in this opinion.

## II.

In order for Alexander to obtain relief, this court must find that the state courts's merits adjudication of his claim of ineffective assistance of counsel -

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Salazar v. Dretke. 419 F.3d 384, 394-95 (5th Cir. 2005). District court findings of fact are reviewed for clear error, issues of law are reviewed *de novo*. Dyer v. Johnson, 108 F.3d 607, 609 (5th Cir. 1997).

## III.

Alexander argues first that the state court's decision is an unreasonable application and a decision contrary to clearly established federal law because the state court required a nexus between the mitigating evidence offered by state post-conviction counsel and the crime for which he was convicted. That requirement, based on prior Fifth Circuit law, was rejected by the Supreme Court in Tennard v. Dretke, 542 U.S. 274, 124 S.Ct. 2562 (2004). However, even faulty reasoning will support a denial of relief so long as the state's ultimate decision is objectively reasonable. 28 U.S.C. § 2254(d); Morrow v. Dretke, 367 F.3d 309, 313 (5th Cir. 2004). "[F]ederal habeas is only merited where the state court decision is both incorrect and objectively unreasonable." Id. We turn then to the analysis of whether the state court was objectively unreasonable in its denial of Alexander's ineffective assistance claim.

## IV.

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that counsel's performance was deficient and (2) that the deficiency prejudiced the defense. Wiggins v. Smith, 539 U.S. 510, 521 (2003), citing Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness" in order to establish a deficient performance. Strickland, 466 U.S. at 688. Based on our review of the record in this case, we conclude that

7

the performance of Alexander's counsel was not deficient based on this standard.

As summarized by the state habeas court, most of the evidence brought forth in Alexander's habeas petition was presented at the punishment phase of the trial either by the state or by trial counsel. Alexander's expert at the state habeas phase, Dr. Cunningham, listed the following areas of deficiency in trial counsel's presentation of mitigating evidence:

> disturbed family of origin,
> genetic susceptibility to drug and alcohol dependence,
> cocaine and methamphetamine abuse,
> orthopedic birth injury and subsequent uncorrected disability,
> parental medical neglect,
> significant psychological disorder in childhood,
> developmental intellectual deficits and learning difficulties,
> peer isolation, alienation and rejection,
> traumatic sexual exposure and precocious onset of puberty, and
> inadequate parental supervision and structure.

Every topic in the list above was addressed at the punishment phase of Alexander's trial except for Dr. Cunningham's conclusions of "parental medical neglect" (relating to their failure to medically correct Alexander's gait and arm structure) and "inadequate parental supervision and structure."

Of the mitigation evidence pointed out by Dr. Cunningham, only a small portion was not covered in some fashion by evidence presented by either the defense or the state. Some of the additional background evidence reported by Dr. Cunningham is fairly benign or addresses problems of other family members. He points out that Alexander's family was socially isolated, his brother John was legally blind and his brother Mark had extensive dental and orthodontic problems in childhood. John, Mark and Alexander suffered isolation

8

as a result of their physical differences. A cousin described the family as "strange" and said the Alexander's father was controlling and bad tempered. Dr. Cunningham concluded that Alexander's mother was dependent on prescription drugs. He also described the relationship between Alexander's parents as characterized by conflict and verbal arguments. Mr. Alexander attended elementary school some distance from his residence. He reported that his physical disability prevented him from being able to participate proficiently in organized recess activities and that he did not attempt to participate in any organized sports. Alexander's symptoms were consistent with a diagnosis of Attention Deficit Hyperactivity Disorder and Alexander took Ritalin in elementary school.

The revelation most relied on by the defense is the fact that at some point, the family became aware that the father, Lee Alexander, was gay and that he made passes at friends of Alexander's brother. Lee made his homosexuality public after his wife's death. Other new information includes the fact that Alexander made a suicide attempt in junior high school and Alexander said that he received psychological/psychiatric treatment throughout elementary school and junior high. Other records indicate that Alexander attempted suicide four times, including once in jail. Alexander also reported that was exposed to explicit pornography at a young age and experienced a precocious onset of puberty.

Another major aspect of the report is Dr. Cunningham's analysis of the implications of each of the above listed aspects of Alexander's life, citing research studies in support of his analysis. Essentially, he faults trial counsel for failing to explain how the circumstances of Alexander's childhood affected him and his culpability.

9

Some of the information about Alexander and the Alexander family was obtained after trial. The information about Lee Alexander's sexual orientation was contained in Dr. Webster's notes which petitioner contends defense counsel did not review. Although not in the record, reference to Lee's homosexuality was also found in the Intake Assessment report at the Carpenter's Workshop, an inpatient drug rehabilitation center in which Alexander was admitted. According to Dr. Cunningham, the Carpenter's Workshop report also included information about Alexander's suicide attempts. Alexander's trial counsel presented affidavits that stated that they had interviewed Alexander and his family members with limited success and hired the experts whose testimony was presented or attempted to be presented at trial. Evidence of Alexander's physical problems was before the jury. Counsel reported that despite diligent investigation, they were unaware of any of the additional evidence raised by Dr. Cunningham.

After an independent review of the record, we agree with the state court that Alexander failed to establish that his counsel's representation was deficient. This is not a case in which counsel failed to discover significant punishment phase evidence due to lax investigation. The state court's finding that trial counsel made a reasonable effort to investigate and present facts for mitigation is fully supported by the record. Counsel interviewed Alexander, his family members and mental-health experts. They presented extensive testimony covering Alexander's drug addiction and attempts at treatment, his family background (including its dysfunction), his work and personal history, his mental and intellectual challenges and his remorse. Part of the information Alexander alleges was

10

lacking in his mitigation case was interwoven with the state's punishment evidence regarding his learning and behavior problems in school and his school records. In summary, the evidence in Dr. Cunningham's report simply enlarges on the extensive evidence counsel presented at trial and contains speculative conclusions.

We contrast this case with the facts of those relied on by Alexander. In Williams v. Taylor, 529 U.S. 362 (2000), trial counsel had failed to prepare for the sentencing until a week beforehand. He failed to discover extensive records graphically describing William's nightmarish childhood, to introduce available evidence that Williams was borderline mentally retarded and did not advance beyond the sixth grade, to seek prison records recording Williams' commendations for helping to crack a prison drug ring and for returning a guard's missing wallet, and to discover the testimony of prison officials who described Williams as among the inmates least likely to act violently, dangerously or provocatively, and of a prison minister that Williams seemed to thrive in a more regimented environment. The evidence offered by Williams' trial counsel consisted of the testimony of Williams' mother, two neighbors and a taped excerpt from a statement by a psychiatrist. The three witnesses, one of whom was called on the spot, briefly described Williams as a nice boy and not a violent person. The psychiatrist relayed a statement by Williams that in the course of one of his earlier robberies he had taken the bullets out of a gun so as not to injure anyone. The Supreme Court understandably concluded that Williams' ineffective assistance claim had merit.

In Wiggins v. Smith, 539 U.S. 510 (2003), the issue was whether the investigation

11

supporting trial counsels' decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. Trial counsel had made a tactical decision to retry guilt in the punishment phase. The Supreme Court concluded that counsel did not conduct a reasonable investigation prior to making that tactical decision. Counsel looked only at the Presentence Investigation Report (PSI) and records of the Baltimore Department of Social Services. Standard practice in Maryland capital cases included the preparation of a social history report. Funds were available to retain a forensic social worker, but counsel did not commission a report. ABA standards also required further investigation - suggesting inquiry into family and social history among other topics. The records that counsel did examine should have led them to investigate further because they contained references to the fact that his mother was a chronic alcoholic, that Wiggins shuttled between several foster homes, and displayed emotional difficulties there. The PSI described Wiggins' personal history as "disgusting." A social history would have revealed that Wiggins had been abused and neglected by his mother, including an incident where his mother burned his hand on a stove, requiring hospitalization. In foster care, Wiggins was subjected to physical abuse and repeated sexual abuse from several sources.

In Rompilla v. Beard, 545 U.S. 374 (2005), the Supreme Court held that even when a capital defendant's family members and the defendant and the defendant himself have suggested that no mitigating evidence is available, a lawyer must make reasonable efforts to obtain and review material counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial. Counsel had made a number of efforts to

12

obtain mitigating information including multiple sessions with the defendants, interviews with family members and examination of reports by three mental health experts. Rompilla's mitigating evidence consisted of testimony of five family members arguing for residual doubt and mercy, saying they believed Rompilla was innocent and a good man. His son testified that he loved his father and would visit him in prison. Counsel did not examine school records or jail records of his prior incarcerations and did not look for evidence of alcohol dependence despite the fact that one of the mental health experts indicated that this was an area that merited further investigation. In addition, trial counsel did not look at the file of Rompilla's prior conviction until warned by the state a second time that they planned to use it in aggravation and then did not examine the entire file. ABA Standards indicate that a lawyer has a duty to investigate all circumstances of a case including information in the possession of the prosecution and law enforcement. The error was prejudicial because the prosecution's file included evidence of Rompilla's childhood and mental health that the defense had never seen - including evidence of an abusive upbringing, quitting school at 16, a series of incarcerations for assaultive behavior that was generally alcohol related, possible schizophrenia and other disorders and low test scores.

None of the above cases require us to find that the state court's determination on this issue is objectively unreasonable. First, this is not a case where defense counsel did nothing or prepared only at the last minute. Defense counsel interviewed several family members and engaged four experts whose testimony was either presented or offered at trial. One of the experts and defense counsel reviewed Alexander's school records and criminal

background. The only records Dr. Cunningham faults trial counsel for failing to examine are Dr. Webster's notes and the intake report of the Carpenter's Workshop. Dr. Webster testified at length at trial. The only information Petitioner contends would have been revealed by the examination of the notes that she did not testify to was the fact the Alexander's father was gay. The Intake Report of Carpenter's Workshop, which was excerpted in Dr. Cunningham's report, also relays the fact that Alexander found that his father was gay after his mother died, that his father made passes at his brother's friends and currently had a 30 year old lover. The report also references his problems dealing with his mother's death and the general dysfunction in his family, both of which were covered by Dr. Webster in her testimony.

Second, the opinions in Williams, Wiggins and Rompilla looked at the quality of the mitigation case put forward by trial counsel as compared to what the petition suggested should have been presented. Although Alexander's family history was not quite as benign as was revealed to defense counsel and presented to the jury, the undiscovered background evidence does not change the fundamental nature of the family history and certainly does not include the type of severe physical or sexual abuse described in the above cases. The new evidence developed by habeas counsel also does not include any evidence of mental illness or even borderline mental retardation beyond what appears to have been presented by the state and Dr. Webster at trial. Although trial counsel did not discover everything revealed by the post-conviction investigation in this case, the undisclosed evidence, including evidence of his father's sexual orientation and behavior, does not reveal a significantly

14

different picture of Alexander's background from what was actually presented during the punishment phase of Alexander's trial. In short, trial counsel's representation was not deficient.

V.

For the reasons stated above, we conclude that the state court's merits adjudication of Alexander's ineffective assistance claim did not result in a decision that was contrary to, or involved an unreasonable application of clearly established federal law and was not based on a unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, we affirm the district court's order dismissing Alexander's habeas petition.

AFFIRMED.