United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 10, 2004**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 02-41592

———————————

ALVIN ANDREW KELLY,

Petitioner-Appellant,

v.

DOUG DRETKE, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

—————————————————————————

Appeal from the United States District Court for the
Eastern District of Texas, Beaumont
No. 1:00-cv-636

—————————————————————————

Before BARKSDALE, DeMOSS, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:[*]

Petitioner Alvin Andrew Kelly was convicted of capital murder in Texas state court and

sentenced to death. Petitioner appeals the district court's summary judgment denial of his petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court granted Petitioner a

certificate of appealability ("COA") on four of the claims. The four claims are: (1) that Petitioner's

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

conviction was obtained through the prosecution's use of perjured testimony; (2) that the prosecution failed to disclose exculpatory evidence; (3) that the prosecution failed to disclose that it had agreed not to prosecute Petitioner's former wife or brother-in-law in exchange for their testimony; and (4) that the district court made impermissible credibility determinations in connection with its grant of summary judgment.[1]

This Court denied Petitioner's request to grant him a COA as to seven additional issues. *Kelly v. Cockrell*, 72 Fed. Appx. 67 (5th Cir. 2003). We now plenarily review the claims for which a COA was granted by the district court. For the following reasons, the district court's denial of Petitioner's petition for a writ of habeas corpus is affirmed in part and reversed in part. The case is remanded for further proceedings.

## I. BACKGROUND[2]

On the morning of May 1, 1984, in Gregg County, Texas, the bodies of Jerry Morgan ("Jerry"), his wife Brenda Morgan ("Brenda"), and their twenty-two month old son Devin Morgan ("Devin") were discovered in their home by other family members. Each victim died of gunshot wounds. Various items were missing from the victims' home, including a 1977 Pontiac Catalina, a .22 caliber revolver, a .380 semi-automatic pistol, a 7-millimeter rifle, a Remington 870 pump action

---

[1] Petitioner contends that the district court made credibility determinations that are inappropriate at the summary judgment stage. *See Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002). In his brief, Petitioner alleges that these credibility determinations only tainted the district court's resolution of the three substantive issues for which a COA was granted. As such, this is not a separate ground for relief, but rather a further procedural attack on the three substantive COA issues. We will address this averred error in our resolution of the three substantive issues.

[2] The factual and procedural background is taken largely from our denial of Petitioner's request for a COA as to additional issues, *Kelly*, 72 Fed. Appx. at 68-72.

shotgun, a .38 caliber derringer, a television set, a video recorder, a stereo, decorative brass butterflies, and a coffee maker.

These murders went unsolved for six years. In 1990, a man named Chris Vickery called the Gregg County Sheriff's Office and indicated that Cynthia May Kelly Cummings ("Cynthia"), Petitioner's former wife, had information for the authorities. At that time, Cynthia lived in Michigan, and Petitioner was serving a 30-year sentence in Texas for the murder of John Ford.[3] The authorities contacted Cynthia, and ultimately obtained an indictment charging Petitioner with the capital murder of Devin during the course of the robbery of Jerry.

At trial, Steven Kelly ("Steven"), Petitioner's younger brother, testified that Petitioner and he were in the business of selling drugs. Petitioner's source of drugs was Walter Shannon. Several days prior to the instant offense, Steven drove with Petitioner and Ron Wilson ("Wilson"), a fellow drug trafficker, to the Morgans' home. Prior to exiting the vehicle, Petitioner instructed Steven to remain in the vehicle. Disregarding that instruction, Steven walked around to the back of the house because he heard an argument. Steven observed Petitioner pointing a gun at Jerry and threatening, "I want you to know that I can kill you at any time." Petitioner noticed Steven watching and angrily ordered him back to the vehicle. As Steven returned to the vehicle, he heard Wilson arguing with a woman inside the home. Petitioner and Wilson then returned to the vehicle.

As the three men drove away, Wilson, obviously upset, said to Petitioner, "I told you not to bring him [Steven] because . . . we're supposed to take care of some business, and . . . we didn't take care of it, . . . we're supposed to prove a point, and now, that they're going to be upset with us."

---

[3]     Petitioner pleaded guilty to the unrelated murder of John Ford which occurred after the Morgan murders.

3

Petitioner responded, "We can always come back later and take care of it . . . there's no problem there."

Steven further testified that a few days later on the night of April 30, 1984 (the night of the instant offense), Petitioner, Wilson, and Cynthia arrived at his house after he and his wife went to bed. Appearing very nervous and in a hurry, Petitioner said he was in serious trouble and needed money. Petitioner confessed that he had killed the family Steven had seen him threaten, and the child was "involved." Petitioner then opened a briefcase, handed Steven a pistol,[4] and asked for "five hundred dollars to get out of town." Steven gave Petitioner five hundred dollars. Petitioner left with Cynthia and Wilson.

Cynthia testified that she met Petitioner sometime in 1982 or 1983, and that they began living together in Tyler, Texas.[5] Cynthia thereafter became addicted to methamphetamine. She frequently accompanied Petitioner when he sold drugs. Petitioner carried a firearm and had Cynthia carry a pistol to "watch his back."

On the evening of April 30, 1984, after drinking beer and injecting methamphetamine, Cynthia, Petitioner, and Wilson drove to the victims' home. Upon arrival, Petitioner ordered Cynthia to remain in the vehicle. Cynthia had been unaware of both the destination and the purpose of this trip. While waiting for the men, Cynthia heard gunfire and a baby crying. She entered the home and saw that Petitioner had a woman, Brenda Morgan ("Brenda"), pinned against the wall and that a baby, Devin Morgan ("Devin"), was crying. Cynthia picked up the child and shielded him from the

---

[4]     Petitioner was wearing a pistol when he entered Steven's house but he did not give that gun to Steven.

[5]     Cynthia and Petitioner were married in 1985, after the Morgan murders.

4

sight of his mother struggling with Petitioner. Petitioner shot Brenda in the back of the neck and dragged her to a bedroom. Cynthia put the baby in a chair and followed Petitioner to the bedroom. Brenda's husband Jerry had already been shot, and Petitioner placed Brenda next to him. Brenda begged Cynthia for help, and Cynthia responded by retrieving a towel and placing it under Brenda's head.

Cynthia returned to the living room and attempted to comfort the crying baby. Petitioner grabbed the crying infant from Cynthia and shot him in the head. Petitioner aimed his gun at Cynthia and ordered her to return to the vehicle. As she left the house, Cynthia heard Petitioner again fire a shot. Cynthia testified that Petitioner used the same gun, a .22 caliber pistol, to shoot both Brenda and the baby.

Petitioner and Wilson took several items from the victims' home, including guns, decorative brass butterflies, and a coffee maker. Petitioner, with Wilson as a passenger, drove the victims' car and ordered Cynthia to follow him in their vehicle. Pursuant to Petitioner's instructions, Wilson and Cynthia assisted Petitioner in wiping the victims' car to destroy any fingerprints evidence. They abandoned the car in a hospital parking lot in Tyler, Texas. Subsequently, while driving, Petitioner and Wilson discussed needing money, and the three "ended up at" Steven's home. Cynthia testified that her memory became "blurry" after that point. She did remember, however, that Petitioner and Steven retreated to the pool room to have a conversation. She did not hear the conversation.

The State introduced evidence corroborating several points of Cynthia's testimony, including the location of Brenda's and Devin's gunshot wounds, the caliber of the murder weapon, the location and position of the bodies in the home, the towel that was found under Brenda's head, and the location of the victims' car, devoid of fingerprints. The State also introduced evidence that Jerry and

5

Brenda had been City Marshal Reserve Officers. The state argued that Petitioner killed the Morgans because they were providing information to law enforcement.

Additionally, Cynthia's sister Violet Brownfield testified that Petitioner "bragg[ed]" about killing a family, including a child. Danny Moore, who met Petitioner through Moore's cousin, testified that Petitioner said that he collected "debts at a forty-sixty split" for Walter Shannon. Moore further testified that Petitioner said he had "taken care of that job . . . [and] need[ed] to go see the man about some money." Petitioner went on to say, "that man, his old lady, and the kid . . . they're not coming back." Petitioner became angry and said, "I warned them, they had a chance. [T]hey wouldn't do nothing." Petitioner warned, "there's going to be a lot more people end up like this if they don't pay up."

Petitioner's defense theory was that the victims were killed by an unidentified black assailant. He relied on the following evidence: (1) hairs with Negroid characteristics were found in vacuum sweepings from the Morgans' home; (2) a pick-up truck was stolen from a parking lot near the victims' abandoned car; (3) two black males were apprehended for the theft of that truck; and (4) a necklace was recovered from the black males that two of the victims' family members initially identified as belonging to Brenda. Petitioner's theory was that Cynthia had a relationship with a black man and that she fabricated her story to protect that man or to attempt revenge against Petitioner or both.[6]

In October of 1991, a Gregg County jury found Petitioner guilty of capital murder. At the

---

[6]    The state introduced evidence through Timothy Fallon, a Trace Evidence Analyst, that the hairs with Negroid characteristics did not match either of the two men apprehended for the truck theft. Additionally, Fallon explained that hair that had Negroid characteristics did not necessarily come from a black individual and could come from a Caucasian individual.

punishment phase of the trial, the state introduced evidence that Petitioner had a bad reputation for violence and a reco rd of criminal convictions, including burglary, unlawful weapon possession, controlled substance delivery and possession, aggravated sexual assault, and murder. The jury affirmatively answered the special issues set forth in Article 37.071(b) of the Texas Code of Criminal Procedure. Accordingly, the trial court sentenced Petitioner to death. The Texas Court of Criminal Appeals affirmed the conviction and sentence. *Kelly v. State,* No. 71,361 (Tex.CrimApp. June 26, 1996). The Supreme Court of the United States denied Petitioner's petition for certiorari. *Kelly v. Texas,* 520 U.S. 1145 (1997).

Petitioner filed a state habeas petition. The state trial court recommended denying relief. The Court of Criminal Appeals denied relief without written order. *Ex parte Kelly,* No. 36,791-10 (Tex.Crim.App. April 8, 1998). The Supreme Court of the United States denied certiorari. *Kelly v. Texas,* 525 U.S. 891 (1998).

The federal district court dismissed Petitioner's first federal habeas petition as unexhausted. Petitioner then filed a second application for state post-conviction relief, which was dismissed as an abuse of the writ by the Texas Court of Criminal Appeals. *Ex Parte Kelly,* No. 36,791-02 (Tex.Crim.App. September 13, 2000). Petitioner then filed the instant petition, the district court's denial of which he appeals.

## II. STANDARD OF REVIEW

We review *de novo* the district court's entry of summary judgment denying a petition for a writ of habeas corpus. *See Guy v. Cockrell*, 343 F.3d 348, 351 (5th Cir. 2003). That is, we "review the district court's factual and legal conclusions *de novo*, reviewing 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits' to determine whether

7

'there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 352 (quoting Fed. R.Civ. P. 56(c)). "Credibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

In undertaking our *de novo* review, we are mindful that, because Petitioner's § 2254 petition was filed in the district court after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, the petition is subject to the procedures imposed by the AEDPA. *Lindh v. Murphy,* 521 U.S. 320, 336 (1997). "Under the [AEDPA], a federal court can grant an application for a writ of habeas corpus on behalf of a person held pursuant to a state-court judgment if the state-court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2143 (2004) (quoting 28 U.S.C. § 2254(d)(1)). "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal citation omitted). This is all to say that "[w]e cannot grant relief under [the] AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter." *Alvarado*, 124 S. Ct. at 2150.

A federal court may also issue a writ of habeas corpus pursuant to § 2254 if the state habeas proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C.A. § 2254(d)(2) (West 2004); *see also Wiggins*, 539 U.S. at 528. Throughout our review, we presume correct the factual

8

determinations made by the state habeas court, though Petitioner can rebut this presumption by clear and convincing evidence. 28 U.S.C.A. § 2254(e)(1) (West 2004); *see also Wiggins*, 539 U.S. at 528.

### III. ANALYSIS

### a. ISSUE ONE: The state's alleged use of perjured testimony

Petitioner claims that the state knowingly allowed perjured testimony to be presented to the jury at the guilt/innocence phase of his trial.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). This is because the use of such perjured testimony violates the due process clause of the Fourteenth Amendment. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

In his pleadings before the district court, Petitioner offered eight instances in which he claims that the state knowingly allowed perjured testimony to be presented to the jury or to defense counsel without correction. Petitioner concedes that only two of the sub-claims were presented to the state habeas court and that the rest were procedurally defaulted. *See Lambriz v. Singletary*, 520 U.S. 518, 523 (1997). Petitioner argues, however, that this default is excused because he has shown cause and prejudice and that failure to consider these alleged instances of the use of perjured testimony would result in a fundamental miscarriage of justice. *See Murray v. Carrier*, 477 U.S. 478, 485-86 (1986). The district court, rather than determining whether cause and prejudice existed to excuse the procedural default, ruled on the merits of the defaulted claims. *See* 28 U.S.C.A. § 2254(b)(2) (West 2004).

The two alleged instances of perjury that were procedurally defaulted are: 1) Cynthia's

testimony at trial that Jerry was dead before she entered his home, and 2) Cynthia's testimony at trial that she was not offered anything by the state in exchange for her testimony. The remaining alleged instances of perjury are: 1) Cynthia's deposition testimony that she did not participate in the murder of John Ford; 2) Cynthia's trial testimony that she saw three brass butterflies that had come from the Morgans' home for the first time on the morning after the murders; 3) Cynthia's trial testimony that she carried a weapon only when directed to do so by Petitioner; 4) Cynthia's trial testimony that Petitioner shot Devin; 5) Cynthia's deposition testimony that she never spoke about the Morgan murders with Detective Roy Bean; and 6) Steven's trial testimony that Petitioner confessed to killing the Morgan family. We first address the non-defaulted alleged instances of the state's use of perjured testimony and then turn to the district court's resolution of the procedurally defaulted instances.

### 1. The non-defaulted claims

#### A. Cynthia did not claim to have killed Jerry

Petitioner argues that the state knew that Cynthia told her sister that she (Cynthia) killed Jerry. This would, of course, conflict with Cynthia's trial testimony. The state habeas court, however, found that "Cynthia May Kelly Cummings never told her sisters that she shot Jerry Morgan. Cynthia talked about a nightmare to her sister that she had shot a man." *Ex Parte Alvin Andrew Kelly*, No. 18,693-B-H-1, Findings of Fact and Conclusions of Law (Jan. 23, 1998) at ¶ 12, SHR at 551. Petitioner points to nothing to suggest that this finding of fact was unreasonable in light of the evidence presented. *See* 28 U.S.C.A. § 2254(d)(2) (West 2004). Neither has Petitioner pointed to anything that would clearly and convincingly show this finding of fact to be incorrect. *See* 28 U.S.C.A. § 2254(e)(1) (West 2004).

Because Cynthia never told her sister that she killed Jerry, the prosecution did not knowingly

present perjured testimony to the jury with respect to this issue. *See also Kelly*, 72 Fed. Appx. at 75-76. The state habeas court's conclusion of law, therefore, was neither contrary to nor an unreasonable application of clearly established federal law. *See* 28 U.S.C.A. § 2254(d)(1) (West 2004); *Alvarado*, 124 S. Ct. at 2143. Summary judgment as to this alleged incident of perjury was appropriate.

### B. Cynthia was not offered a deal by the state

Petitioner argues that the state offered Cynthia a deal in exchange for her testimony against him at trial. By allowing her to testify otherwise, Petitioner argues, the state knowingly presented perjured testimony to the jury. The state habeas court found that "[t]here was no agreement between the state and Cynthia May Kelly Cummings that she would not be prosecuted for the murders to induce her to testify." *Ex Parte Alvin Andrew Kelly*, No. 18,693-B-H-1, Findings of Fact and Conclusions of Law (Jan. 23, 1998) at ¶ 21, SHR at 552. Petitioner points to nothing to suggest that this finding of fact was unreasonable in light of the evidence presented. *See* 28 U.S.C.A. § 2254(d)(2) (West 2004). Neither has Petitioner pointed to anything that would clearly and convincingly show this finding of fact to be incorrect. *See* 28 U.S.C.A. § 2254(e)(1) (West 2004). Moreover, Cynthia did not commit any act sufficient to support a conviction as an accomplice. *See Kelly*, 72 Fed. Appx. at 74.

The state, then, did not knowingly present perjured testimony with respect to this issue. The state habeas court's conclusion of law, therefore, was neither contrary to nor an unreasonable application of clearly established federal law. *See* 28 U.S.C.A. § 2254(d)(1) (West 2004); *Alvarado*, 124 S. Ct. at 2143. Summary judgment as to this alleged incident of perjury was appropriate.

### 2. The defaulted claims

11

*A. Cynthia's deposition testimony that she did not participate in the murder of John Ford*

Cynthia claimed that she did not participate in the murder of John Ford in her deposition taken by Petitioner's trial counsel. Petitioner produced affidavits in which Ricky and Shelly Kelly allege that Cynthia told them that she killed John Ford. In a subsequent affidavit, Cynthia denied ever claiming to have shot anyone. As the district court noted, this does present a controverted factual issue. The district court was correct in noting that this fact issue, however, was not material largely because Petitioner pleaded guilty to murdering John Ford.

Petitioner does not explain how Cynthia's *deposition* testimony was used to obtain the conviction at trial. *See Agurs*, 427 U.S. at 103. This failure alone defeats Petitioner's position. Moreover, Cynthia never testified at trial about the murder of John Ford because Petitioner's trial counsel filed a motion *in limine* to preclude such testimony in an effort to keep the jury unaware of Petitioner's prior murder conviction during the guilt/innocence segment of the trial.

Moreover, the prosecutors, even if told of Cynthia's alleged statement by Ricky Kelly, would have had no reason to believe Ricky Kelly's second-hand account of a statement made by Cynthia (a statement she denied making) over Petitioner's admission that he killed John Ford. Assuming true everything that Petitioner has claimed with respect to this alleged incident of perjury, Petitioner does not present a genuine issue of material fact.

As a matter of law, with respect to this alleged incident, Petitioner cannot show that the state knowingly allowed Cynthia to testify falsely and that the testimony led to the conviction. *See Agurs*, 427 U.S. at 103. Absent such a showing, the claim fails. Summary judgment as to this alleged incident of perjury was appropriate.

*B. The three brass butterflies*

12

Cynthia saw three brass butterflies at the Morgans' home the night that they were killed. In 1990, Cynthia executed an affidavit in which she stated that she saw the butterflies in her closet on the night of the murder. In August 1991, however, she indicated that the first time that she saw the butterflies in her closet was the morning after the Morgan murders. At trial, in October 1991, she reiterated that the first time that she remembered seeing the butterflies in her closet was the morning after the murders.

Petitioner alleges that Cynthia perjured herself at trial. Petitioner also alleges that the state knowingly allowed this perjury because prosecutors knew of the 1990 deposition. Petitioner offered no evidence tending to show that the prosecution had any reason to believe her 1990 deposition was correct and that she perjured herself at trial. Petitioner's counsel cross-examined Cynthia with respect to her apparently contradictory testimony. The state did not hide this conflict, and Petitioner was given opportunity to develop it.

Petitioner gives us no reason to believe that the prosecution knew that Cynthia's testimony with respect to the butterflies was false (if indeed it was false). *See Agurs*, 427 U.S. at 103. Summary judgment as to this alleged incident of perjury, therefore, was appropriate.

*C. Cynthia's trial testimony that she carried a weapon only when directed by Petitioner*

Cynthia testified at trial that she only carried a gun when directed to by Petitioner. Petitioner alleges that, in an interview with a defense investigator after the trial, Cynthia stated that she carried a gun whenever she and Petitioner collected drug money. As the district court noted, these statements are not mutually exclusive. Petitioner has also failed to show perjury and failed to show that the state knew that Cynthia carried a firearm in such circumstances.

As a matter of law, with respect to this alleged incident, Petitioner cannot show that the state

13

knowingly allowed Cynthia to testify falsely. *See Agurs*, 427 U.S. at 103. Absent such a showing, the claim fails. Summary judgment as to this alleged incident of perjury was appropriate.

*D. Cynthia's alleged statement to Nancy Brown that Petitioner did not kill the baby*

Petitioner claims that, in a statement to Nancy Brown, Cynthia recanted her trial testimony. Petitioner also claims that the prosecution had actual or imputed knowledge that Cynthia's testimony was false because state agents coerced her into testifying falsely. Petitioner submitted an affidavit from Nancy Brown in which she stated as much. The district court noted that, if believed, Cynthia's renouncement of her trial testimony may serve as the basis for relief.

As already noted, the district court in its discretion opted to address the claim on its merits, rather than determine whether the procedural default was excused. Finding that Petitioner did not offer any corroboration of Nancy Brown's affidavit, however, the district court found that the affidavit was not credible. *See* Memorandum Opinion (Oct. 17, 2002) at 10 ("The Court therefore finds that Brown's affidavit is not credible."). Nancy Brown's affidavit did raise a material issue of fact.[7] To resolve that question of material fact, the district court made a credibility determination. "Credibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C.*, 308 F.3d at 458 (5th Cir. 2002).

Accordingly, we must reverse the district court's grant of summary judgment on this sub-claim and remand for proper disposition of this claim. We, of course, express no opinion as to the

---

[7] While it appears that the district court made a reasonable analysis of whether Nancy Brown's affidavit was credible, we cannot, nor can the district court, make such a determination on summary judgment. We note, however, that, even if Nancy Brown's affidavit were ultimately accepted as true, it does not mean *a fortiori* that Petitioner is entitled to any relief. Cynthia may have lied to Nancy Brown. In any case, without a proper factual finding that Nancy Brown's affidavit is not credible, it is inappropriate to dispose of the claim on summary judgment.

14

ultimate resolution of this claim either on the merits or as procedurally defaulted.

*E. Cynthia and Detective Roy Bean*

In her defense deposition, Cynthia claimed to never talk about the Morgans with Detective Roy Bean. Detective Bean, however, stated by affidavit that he spoke with Cynthia about the Morgan murders on several occasions, but that she refused to go into details unless she was promised immunity. The district court noted that these two statements were not necessarily contradictory.

We need not determine this, however, because Petitioner has not shown how Cynthia's *deposition* testimony that she never talked about the Morgans with Detective Bean, even if false and known by the state, was in any way used to obtain Petitioner's conviction. *See Agurs*, 427 U.S. at 103. Absent such a showing, the claim fails. Summary judgment as to this alleged incident of perjury was appropriate.

*F. Steven's statements that he testified against Petitioner for a crime that Petitioner did not commit*

Steven testified at trial that Petitioner admitted to him on the night of the Morgan murders that Petitioner killed the Morgan family, including Devin. Later, Steven allegedly stated to his niece and her husband that he "turned state's evidence against his brother for a crime he didn't do." Assuming Steven did fabricate Petitioner's confession, Petitioner has failed to make any showing that the state knew Steven was perjuring himself at trial. *See Agurs*, 427 U.S. at 103. Absent a showing that the state knew the witness was testifying falsely, the claim fails. Summary judgment as to this alleged incident of perjury was appropriate.

*3. Recapitulation of Issue One*

All but one of the alleged uses of perjured testimony fail as a matter of law. Summary

15

judgment as to those issues is appropriate.

Petitioner's claim that Cynthia admitted to Nancy Brown that she testified falsely because agents of the state threatened her, however, cannot be defeated on the merits without making a credibility determination regarding Nancy Brown's affidavit. At summary judgment it is inappropriate to make such a determination. We must, therefore, reverse and remand as to this part of Issue One.

**b. ISSUE TWO: The state's alleged failure to disclose material exculpatory evidence**

Kelly contends that the state, in violation of *Brady* and its progeny, failed to disclose evidence that could have been used to impeach Cynthia or otherwise aid in his defense. "*Brady*, we reiterate, held that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 124 S. Ct. 1256, 1272 (2004) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

There are "three components or essential elements of a *Brady* prosecutorial misconduct claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the state, either willfully or inadvertently; and prejudice must have ensued.'" *Banks*, 124 S. Ct. at 1272 (quoting *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)). As to the prejudice, or materiality, requirement, "[i]t is not whether the result [at trial] would have been different. Rather, it is whether given the non-disclosures of material evidence the verdict is less worthy of confidence." *Morrow v. Dretke*, 367 F.3d 309, 316 (5th Cir. 2004).

The state contends that this claim is procedurally defaulted. Petitioner argues, as he does with respect to his first claim, that this default is excused because he has shown cause and prejudice and

16

that failure to consider these alleged instances of the use of perjured testimony would result in a fundamental miscarriage of justice. *See Murray v. Carrier*, 477 U.S. 478, 485-86 (1986). The district court declined to determine whether the claim was procedurally defaulted, and, if so, whether the default was excused. Instead, it denied the claim on the merits. *See* 28 U.S.C.A. § 2254(b)(2) (West 2004).

Petitioner alleges that the government failed to disclose the following: 1) that Cynthia and her baby were threatened with death if she did not testify against Petitioner; 2) that Cynthia discussed the Morgan murders with Detective Roy Bean several years prior to 1989 despite having claimed during a deposition that she first contacted the prosecution regarding the murders in 1989; 3) that Cynthia was more deeply involved in Petitioner's drug dealing than she admitted in a defense deposition and at trial; 4) that Cynthia helped dispose of John Ford's body and the weapon used to kill him, and that she admitted being involved in killing John Ford; 5) that Cynthia was on Demerol when she testified at Petitioner's trial; 6) that, during an argument, Cynthia produced a machine gun and threatened Bill Morgan; 7) that Cynthia once shot at Petitioner and was involved in a four-way standoff where she and the other three participants were armed; 8) that Cynthia used drugs and cooked methamphetamine; 9) that in 1985, Cynthia lied to her doctor by telling him that her first two children had been killed when they had been removed by the state and by indicating that she did not have a drug problem despite having a drug problem;10) that Cynthia requested and was made offers of witness protection; and 11) that Walter Shannon was in Tyler the day after the Morgan murders and said that he had dropped off a car at the hospital.

### 1. Alleged impeachment evidence related to Cynthia

We first address the first through tenth allegedly withheld facts related to Cynthia. To

17

overcome the procedural default bar to federal habeas consideration of this claim, Petitioner urges as prejudice that, had these facts been disclosed, his trial counsel could have more convincingly impeached Cynthia's key testimony. It is uncontested that Cynthia was a key prosecution witness.

As to the first sub-claim, that the state failed to disclose that Cynthia was coerced by law enforcement into testifying against Petitioner, the district court acknowledged that if Nancy Brown's affidavit, the same affidavit discussed *supra*, were true, then Petitioner may have a claim for relief. The district court, however, made a credibility determination that the affidavit was not credible. This was inappropriate at summary judgment for the same reason discussed vis-a-vis Nancy Brown's affidavit in the first claim. Accordingly, we must reverse this part of the summary judgment and remand for further proceedings. We again note that we take no position as to the ultimate disposition of this sub-claim, either on its merits or on procedural defaults grounds.

As to the second sub-claim, that the state failed to disclose that Cynthia had been in contact with Detective Roy Bean prior to 1989, but refused to discuss the Morgan murders in detail, Petitioner does not indicate how this is materially exculpatory or impeaching evidence. Cynthia never testified regarding her contact with investigators prior to 1989. It is not clear what this would impeach, other than Cynthia's general truthfulness. As the district court noted, however, Detective Roy Bean's and Cynthia's statements do not necessarily conflict. This allegation, if true, in no way diminishes our confidence in the verdict. *See Morrow*, 367 F.3d at 316. Accordingly, this sub-claim fails. Summary judgment as to this allegedly withheld piece of evidence was appropriate.

Petitioner's third sub-claim is that the state failed to disclose that Cynthia was more deeply

18

involved in Petitioner's drug dealing than she admitted in a defense deposition and at trial.[8] Petitioner has not made any showing that the Prosecution knew, and therefore suppressed, evidence of Cynthia's involvement in Petitioner's drug trade. Moreover, Petitioner would have know the extent of Cynthia's involvement with him selling drugs. Failure to disclose evidence of which the Petitioner has first hand knowledge is not a basis for relief. *See Williams v. Brown*, 609 F.2d 216, 221 (5th Cir. 1980). Accordingly, this sub-claim fails. Summary judgment as to this allegedly withheld piece of evidence was appropriate.

Similarly Petitioner's fourth sub-claim, that the state failed to disclose that Cynthia helped dispose of John Ford's body and the weapon used to kill him, fails because Petitioner pleaded guilty to the crime. He, therefore, had first hand knowledge of the murder. *See id.* Summary judgment as to this allegedly withheld piece of evidence was appropriate.

Petitioner's fifth sub-claim, that the state failed to disclose that Cynthia was on Demerol when she testified at Petitioner's trial also fails. Petitioner has offered no evidence that reasonably supports his contention that the government knew, or had any legitimate reason to believe, that Cynthia was on Demerol during the trial. Absent any reason to know that Cynthia was on Demerol, the government could not have suppressed such evidence. Moreover, even if the government did suppress the fact that Cynthia was on Demerol, the suppression fails the prejudice test. We in no way have less confidence in the verdict because of the suppression. *See Morrow*, 367 F.3d at 316. Accordingly, Petitioner fails on this sub-claim. Summary judgment as to this allegedly withheld piece of evidence was appropriate.

_____

[8]     Although this claim references statements made by Cynthia at trial, Petitioner has not offered this to support his claim that the state knowingly used perjured testimony to secure the conviction.

19

Petitioner's sixth and seventh sub-claims, that the state failed to disclose that during an argument Cynthia produced a machine gun and threatened Bill Morgan and that Cynthia once shot at Petitioner and was involved in a four-way standoff where she and the other three participants were armed, both fail. Petitioner was present for these events. Accordingly, he had firsthand knowledge of what transpired. *See Williams*, 609 F.2d at 221. Summary judgment as to these allegedly withheld pieces of evidence was appropriate.

Similarly, the eighth sub-claim, that the government failed to disclose that Cynthia was heavily involved in drugs, fails. Petitioner does not make a showing as to how the government suppressed her use of drugs. This fact was well known and Cynthia told Petitioner's counsel as much. *See* Exhibit 51 (Dist. Ct. R. at 508) attached to Petitioner's First Supplemental Application for Writ of Habeas Corpus (Dist. Ct. Doc. 48). This claim fails because Petitioner knew the information. *See Williams*, 609 F.2d at 221. Summary judgment as to this allegedly withheld piece of evidence was appropriate.

Petitioner's ninth sub-claim, that the government failed to disclose that in 1985, Cynthia lied to her doctor by telling him that her first two children had been killed when they had been removed by the state and by indicating that she did not have a drug problem despite having a drug problem also fails. We agree with the district court that Petitioner had failed to show how this would do anything other than minimally impeach Cynthia's general trustworthiness. She did not lie to her doctor as part of an official investigation. This allegation, if true, does not diminish our confidence in the verdict. *See Morrow*, 367 F.3d at 316. Summary judgment as to this allegedly withheld piece of evidence was appropriate.

Petitioner's tenth sub-claim is that the government failed to disclose that Cynthia requested

and was made offers of witness protection. The only evidence Petitioner offers in support of the claim that Cynthia requested or was offered witness protection is an apparent investigation note, the entire relevant part of which reads: "witness protection - Roy Bean?" Exhibit 44 (Dist. Ct. R. at 501), attached to Petitioner's First Supplemental Application for Writ of Habeas Corpus (Dist. Ct. Doc. 48). There is no actual proof that Cynthia requested or was offered witness protection.

Moreover, even if there were proof that she requested or was offered protection, the sub-claim fails. Petitioner argues that this fact would impeach her deposition testimony that she "'really did not give a lot of thought' to whether she could be prosecuted and that she had no deals with the State" Appellant's Br. at 45 (quoting Exhibit 51 (Dist. Ct. R. at 501)), attached to Petitioner's First Supplemental Application for Writ of Habeas Corpus (Dist. Ct. Doc. 48)). These statements do not conflict. Witness protection and an agreement not to prosecute are not the same. This evidence is not impeaching and is, therefore, of no discernable benefit to Petitioner. *See Banks*, 124 S. Ct. at 1272. This sub-claim, therefore, raises no genuine issue of material fact. Summary judgment as to this allegedly withheld piece of evidence was appropriate.

### 2. Alleged impeachment evidence related to Walter Shannon

Petitioner alleges that the state knew that a man named Walter, whom Petitioner presumes was Walter Shannon, was in Tyler the day after the Morgan murders and had left a vehicle at the same hospital parking lot in which Petitioner abandoned the Morgans' vehicle. Petitioner argues that this information could have been used to implicate Walter Shannon in the Morgan murders. The district court noted that this information was not material. We agree.

Petitioner's trial strategy was to cast the blame for the murders on an unknown black male. The strategy was based upon was based on the hair containing Negroid characteristics. Walter

21

Shannon was not black. Petitioner, in the single paragraph in which he discusses this sub-claim in his brief, *see* Brief of Appellant at 46, does not begin to show how he could have used this evidence to cause a jury to believe Walter Shannon may have possibly committed the Morgan murders, thereby creating a reasonable doubt as to Petitioner's guilt. We in no way have less confidence in the verdict because of the state's purported failure to disclose this information. *See Morrow*, 367 F.3d at 316. Accordingly, this sub-claim fails. Summary judgment as to this allegedly withheld piece of evidence was appropriate.

### *3. Recapitulation of Issue Two*

All but one of the allegedly withheld pieces of material evidence do not cause us to lose any amount of confidence in the verdict, either because the facts were known to Petitioner, the facts were not impeaching, or the facts would have had no impact on a jury. Those sub-claims, therefore, fail as a matter of law.

As to the first allegedly withheld piece of evidence, that Cynthia was coerced by law enforcement into testifying falsely against Petitioner, however, we cannot be certain that our confidence in the verdict would not be undermined if Nancy Brown's affidavit were true. At summary judgment it is inappropriate to make such a credibility determination. We must, therefore, reverse and remand as to this part of Issue Two.

### c. ISSUE THREE: The state's alleged failure to disclose agreements made with witnesses

Petitioner alleges that the prosecution failed to disclose that the state entered into agreements with Cynthia and Steven in which the prosecution agreed not to prosecute Cynthia or Steven for other crimes in exchange for their testimony against Petitioner. Under *Brady* and its progeny, the government must disclose agreements that it has made with witnesses if the

22

agreements could call into question the credibility of a witness. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). As we have noted already, the state habeas court found that no agreements were made with Cynthia. This presumptively correct factual finding has not been rebutted. Cynthia's credibility could not be called into question as a result of a non-existent agreement.

As for Petitioner's apparent argument that the state made a deal with Steven in exchange for his testimony, Petitioner offers nothing in support of this claim. Other than the heading to his discussion of the issue, *see* Brief of Appellant at 55, Petitioner makes no mention of Steven with respect to this issue. As such, to the extent Petitioner actually claims that the state failed to disclose an agreement it made with Steven, Petitioner's complete lack of briefing as to Steven defeats the claim. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

Petitioner's *Giglio* claim does not raise a question of material fact. It fails as a matter of law. Summary judgment as to this claim was appropriate.

## IV. CONCLUSION

Petitioner has failed to show that a genuine issue of material fact exists as to most of his claims. As to the parts of two claims that relate to Nancy Brown's affidavit, however, summary judgment based upon the record presented is inappropriate. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

23